# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                             .  Chapter 11 (Subchapter V)
IN RE:                       .
                             .  Case No. 23-10787(JKS)
ALECTO HEALTHCARE SERVICES,  .
LLC,                         .
                             .
                             .  824 Market Street
                             .  Wilmington, Delaware 19801
               Debtor.       .
. . . . . . . . . . . . . . . .  Wednesday, November 29, 2023
```

TRANSCRIPT OF HEARING RE:
OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO DEBTOR'S
DESIGNATION OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO
REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Jeffrey R. Waxman, Esq.
                             MORRIS JAMES, LLP
                             500 Delaware Avenue, Suite 1500
                             Wilmington, Delaware 19801

For the U.S. Trustee:        Linda Casey, Esq.
                             OFFICE OF THE U.S. TRUSTEE
                             844 King Street, Suite 2207
                             Wilmington, Delaware 19801

Subchapter V Trustee:        Jami Nimeroff, Esq.
                             BROWN MCGARRY NIMEROFF, LLC
                             919 North Market Street
                             Suite 420
                             Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:              Electronically Recorded
                             by Sean Moran, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the Reed Action
Judgment Creditors:              William D. Sullivan, Esq.
                                 William A. Hazeltine, Esq.
                                 SULLIVAN HAZELTINE ALLINSON, LLC
                                 919 North Market Street
                                 Suite 420
                                 Wilmington, Delaware 19801

For LHP Hospital Group:          Mark Minuti, Esq.
                                 SAUL EWING, LLP
                                 1201 North Market Street
                                 Suite 2300
                                 Wilmington, Delaware 19899

APPEARANCES VIA ZOOM:

For the Debtor:                  Brya M. Keilson, Esq.
                                 MORRIS JAMES, LLP

For the Reed Action
Judgment Creditors:              Maureen Davidson-Welling, Esq.
                                 STEMBER, COHN & DAVIDSON-WELLING,
                                  LLC

                                 Colten Fleu, Esq.
                                 MOUNTAIN STATE JUSTICE

For Sherman/Grayson
Hospital, LLC:                   Alan Friedman, Esq.
                                 SHULMAN, BASTIAN, FRIEDMAN
                                  & BUI, LLP

For Medical Properties
Trust, Inc., et al:              Sasha Gurvitz, Esq.
                                 KTBS LAW, LLP

For Medical Properties
Trust, Inc.:                     David M. Klauder, Esq.
                                 BIELLI & KLAUDER, LLC

For the United States:           Leah Lerman, Esq.
                                 U.S. DEPARTMENT OF JUSTICE

For the Pension Benefit
Guaranty Corporation:            Zoe Wadge, Esq.
                                 PENSION BENEFIT GUARANTY
                                  CORPORATION

(Appearances Continued)

```
APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:            Vince Sullivan
                           LAW 360

                           Paula Subda
                           U.S. BANKRUPTCY COURT
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| FOR THE MOVANTS | | | | |
| MICHAEL SARRAO | 14 | 49 | 61 | 71 |

| | PAGE |
|---|---|
| ARGUMENT BY MR. SULLIVAN | 80 |
| ARGUMENT BY MR. WAXMAN | 97 |
| COMMENTS BY MR. MINUTI | 119 |
| FURTHER ARGUMENT | 122 |
| COURT DECISION | (Reserved) |

| EXHIBIT | | IDENT. | EVID. |
|---------|---|--------|-------|
| Exhibit 67 | Payment Summary | 8 | |
| Exhibit 68 | Statements at Docket Number 79 | 71 | 79 |
| Exhibits 2 through 66 | | | 79 |

1    (Proceedings commence at 10:07 a.m.)

2         THE COURT:  -- in Alecto Healthcare Services, LLC,

3    Case Number 23-10787.

4         Good morning, Mr. Waxman.

5    **(No Recording Microphones at Counsel Table and Lectern)**

6         MR. WAXMAN:  Good morning, Your Honor.  May it

7    please the Court, Jeff Waxman of Morris James on behalf of

8    the debtor.

9         With me today in court is Mr. Sarrao, Senior Vice

10   President and General Counsel for the debtor.

11        Your Honor, we have two matters on the agenda

12   today.  The first one is really more of a status report, and

13   I think it's appropriate for that to be heard after the Court

14   issues its decision with respect to the second matter, which

15   is the motion of the Reed Creditors.  And because it's their

16   motion, Your Honor, I think it's appropriate to turn over the

17   podium.

18        Before I do, first, I do want to apologize for

19   getting the binder to you so late yesterday.  The Reed

20   Creditors and the debtor were working through the issues with

21   respect to the underlying documents, and so I do apologize.

22        I also want to apologize because there was an error

23   with respect to the binders and Mr. Sullivan told me about it

24   this morning, so we didn't have a chance to remedy it.  There

25   is -- Number 25 has the wrong proof of claim in it, and we

1    provided Mr. Lugano with a copy of the correct Number 25.

2              THE COURT:  Okay.

3              MR. WAXMAN:  But I did want to alert Your Honor to

4    that.

5              Also, you'll see that there are binders on the

6    witness stand.  One of those binders is open.  The reason for

7    that is we've removed 25 and replaced it with the correct

8    one, but we didn't bring a hole punch with us, so --

9              THE COURT:  Oh --

10             MR. WAXMAN:  -- rather than just trying to fashion

11   a hole, we just left it in.

12             THE COURT:  Okay.

13             MR. WAXMAN:  And I just wanted to explain that to

14   Your Honor.

15             With that, I will turn over the podium to Mr.

16   Sullivan (indiscernible)

17             THE COURT:  Okay.  Great.  Thank you.

18             And I appreciate -- I didn't necessarily need the

19   exhibit binder.  What I wanted was the identity of witnesses

20   for today, so that was helpful to know.

21             MR. WAXMAN:  Your Honor, we do have a full binder,

22   if Your Honor would like.

23             THE COURT:  I have --

24             MR. WAXMAN:  If not --

25             THE COURT:  -- what you --

1          MR. WAXMAN:  -- we will give --

2          THE COURT:  -- deliver.

3          MR. WAXMAN:  If not, we will certainly give it to

4     Ms. Werkheiser, if she would --

5          THE COURT:  Yeah, that would be terrific.  Thank

6     you.

7          MR. WAXMAN:  All right.

8          THE COURT:  Mr. Sullivan, can you bear with me one

9     second?

10          MR. SULLIVAN:  Yes.

11          THE COURT:  I want to get a hole punch in here --

12          MR. SULLIVAN:  Okay.

13          THE COURT:  -- so that's not lost.

14          MR. WAXMAN:  If I may approach Ms. Werkheiser, Your

15     Honor.

16          THE COURT:  Certainly.

17        (Pause in proceedings)

18          THE COURT:  Okay.  Yes.

19          MR. SULLIVAN:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. SULLIVAN:  Bill Sullivan of Sullivan Hazeltine

22     Allinson on behalf of the Reed Action Judgment Creditors.

23          Your Honor, with respect to the exhibit list,

24     there's also a summary exhibit of the payment information

25     provided at Exhibits, I guess, 47 to 66 that I can -- shared

1    with Mr. Waxman yesterday.  But basically, just a summary of

2    -- regarding payments that are identified in those.  And I

3    can hand it up now or you -- I can -- you -- we can wait

4    until I examine Mr. Sarrao.  But it's probably beneficial for

5    the Court to have it now.

6              THE COURT:  Okay.

7              MR. SULLIVAN:  I would propose that we mark it as

8    Exhibit 67 and we can talk about admitting it later

9    (indiscernible)

10             THE COURT:  Okay.

11             MR. SULLIVAN:  So can I ...

12             THE COURT:  Yes, please.

13         (Participants confer)

14         (Payment Summary marked Exhibit 67 for identification)

15             THE COURT:  Thank you, Mr. Lugano.  Thank you, Mr.

16   Sullivan.

17         (Participants confer)

18             MR. SULLIVAN:  And then the last exhibit issue,

19   Your Honor, is we have a replacement Exhibit 1 because

20   there's one additional claim that has been added.

21             THE COURT:  Okay.

22             MR. SULLIVAN:  So, Your Honor, I'll just hand that

23   one up

24             THE COURT:  Thank you.

25         (Pause in proceedings)

1          MR. SULLIVAN:  And Your Honor, with that, I hope

2     that's -- those are the only holes in my presentation today.

3          Your Honor, we're here today on the debtor -- on

4     the Reed Creditors' objection to the debtor's election to

5     proceed under Subchapter V of the Bankruptcy Code and the

6     corresponding motion to revoke that designation.

7          Your Honor, this is a case of clear statutory

8     interpretation.  Section 1182 of the Bankruptcy Code limits

9     Subchapter V to debtors that have less than 7.5 million in

10    liquidated and non-contingent debts as of the petition date.

11         Exhibit A to the objection motion, which is Exhibit

12    1 in the binder, is the chart that shows the schedule and

13    then the filed claims that superseded the scheduled claims

14    against the debtor that total, as attached to the motion, it

15    was 7.89 million.  As totaled on the amended Exhibit 1, which

16    I just handed up to Your Honor, the total is 8.1 million.

17         The amendment simply adds one claim that is

18    referenced in the motion; that is Claim 18.1 of the claim

19    filed on behalf of Alecto Healthcare Services Ohio Valley,

20    LLC Health Plan by the ESPA, which is a division of the

21    Department of Labor.  Your Honor, that change is not

22    material, in terms of the outcome of the case, from our

23    perspective, but we did want to update the exhibit

24    appropriately.

25         The debtor's response to the objection motion

1   (indiscernible) since the last motion is generally limited to

2   contesting the claim of LHP Hospital (indiscernible) which is

3   Claim Number 15.1, and which was asserted in the amount of

4   approximately $3.74 million.  The debtors submitted a

5   response and we submitted a reply that is generally directed

6   to those issues.

7           THE COURT:  Well, so let me ask you, Mr. Sullivan.

8   Does your client agree that whether LHP is unliquidated or

9   contingent controls the whole eligibility determination here,

10  or are there other claims the Court should be taking into

11  consideration?

12          MR. SULLIVAN:  No, Your Honor.  We believe that

13  that is the claim that controls it.  It was -- if it's not

14  contingent and liquidated, then they're not eligible.  And if

15  the Court finds otherwise, then there's (indiscernible) they

16  would be.

17          Your Honor, as we set forth in the reply and in the

18  cases relevant to this issue, the claim is not contingent

19  because contingent claims depend on a future event for fixing

20  liability, which is not the case with respect to the LHP

21  claim.

22          And secondly, the claim is not unliquidated because

23  it is readily subject to calculation.  And in fact, Your

24  Honor has evidence of the amount that LHP has paid and for

25  which the debtor has agreed to guarantee in the record, in

1    terms of both the payments that were made and the obligations

2    of the debtor that accrued as of the petition date.  So we

3    believe the evidence will show that the LHP claim will be

4    either contingent or unliquidated and must be included in the

5    calculation for the determination of eligibility.

6         Your Honor, as noted in our opening brief, it is

7    the debtor's burden to prove that it is eligible for the

8    election that it made on the petition form.  But with that,

9    we are prepared to move forward.

10        I do have some examination of Mr. Redding [sic] and

11   would propose to move forward with that, unless Your Honor

12   wants to hear any --

13        THE COURT:  Well, let me just ask you a question,

14   Mr. Sullivan.  So, neither the Bankruptcy Code, nor the

15   Bankruptcy Rules provide a standard for evaluating a motion

16   to revoke a Subchapter V election.  What would be your

17   position?  What standard should the Court be imposing here?

18        MR. SULLIVAN:  So I think it -- you know, if you're

19   talking about the business plan, it's the standard of

20   preponderance of the evidence, as far as -- as far as the

21   issue of whether the debtor has -- meets its burden or -- and

22   whether we're able to overcome that or prevent the debtor

23   from meeting that burden.

24        But with respect to the issues, Your Honor, I think

25   the case are fairly clear that we're not -- you're not

1    limited to looking at the debtor's schedules; that you're

2    looking at what are the debtor's obligations as of the

3    petition date.  And it is -- you're entitled to look at the

4    claims that have been asserted.  And I think we also

5    indicated that, just because a claim may be disputed does not

6    mean it is either contingent or unliquidated, so ...

7                THE COURT:  Okay.  Thank you.

8                MR. SULLIVAN:  All right.  Well, I would propose to

9    call Mr. Sarrao as --

10               THE COURT:  Okay.  Let me just say the Judicial

11   Conference of the United States approved a change to the

12   broadcasting policy that affects the ability of public

13   attendees to access bankruptcy proceedings via remote means.

14   So judges presiding over bankruptcy proceedings are permitted

15   to provide the public, including members of the media, with

16   audio-only access to proceedings that do not involve witness

17   testimony.  So this means that members of the public that

18   wish to observe hearings containing witness testimony must

19   attend the hearing in person at the courthouse.

20               So, to the extent that there are parties who are on

21   Zoom who cannot listen to this proceeding, I'm going to ask,

22   before Mr. Sarrao is sworn in, that the ECRO take the

23   appropriate means to ensure there's no broadcasting.

24               Okay.  All right.  Any objection to calling Mr.

25   Sarrao?

```
1              MR. WAXMAN:  I don't -- Jeff Waxman of Morris James

2      on behalf of the debtor.

3              We have no objection to that, subject to the right

4      to cross, I guess --

5              THE COURT:  Certainly.

6              MR. WAXMAN:  -- our own witness.

7              I didn't know if Your Honor wanted to hear opening

8      statements from the debtor first, or we're happy to

9      (indiscernible)

10             THE COURT:  I mean, I don't -- do you have an

11     opening statement?

12             MR. WAXMAN:  We do, but --

13             THE COURT:  I'm happy to hear it.

14             MR. WAXMAN:  We do, but we're -- the debtor is fine

15     reserving until after evidence for oral argument.

16             THE COURT:  Okay.  Well, let me ask.  Is -- are the

17     only parties participating in this the Reed Judgment

18     Creditors and the debtor?  Does -- is the U.S. Trustee or any

19     other party wishing to be heard today?

20             MR. SULLIVAN:  I'm not aware that either the U.S.

21     Trustee or the --

22             THE COURT:  Or the --

23             MR. SULLIVAN:  -- or the Subchapter V Trustee --

24             THE COURT:  Okay.

25             MR. SULLIVAN:  -- wants to take a position.
```

1          THE COURT:  All right.  Okay.

2          Yes, sir.

3       MICHAEL SARRAO, WITNESS FOR THE MOVANTS, AFFIRMED

4          THE ECRO:  Can you please state your full name and

5    spell your last name for the record?

6          THE WITNESS:  Michael Sarrao, S-a-r-r-a-o.

7          THE ECRO:  Thanks.  Have a seat.

8          THE COURT:  Mr. Sarrao and Mr. Sullivan, we're

9    having a little difficulty picking you up on microphones.  So

10   can you please make sure that, A, you keep your voice up;

11   and, B, that you're close to the microphone?  Thank you.

12                      DIRECT EXAMINATION

13   BY MR. SULLIVAN:

14   Q    Good morning, Mr. Sarrao.

15   A    Good morning, Mr. Sullivan.

16   Q    Mr. Sarrao, do you have the binder of exhibits in front

17   of you?

18   A    Is the exhibit binder the bigger binder?

19   Q    Yes.

20   A    I do have it, I do have it in front of me.

21   Q    Okay.  And have you looked at the exhibits that are in

22   that binder before the hearing today?

23   A    Before today, yes.

24   Q    Okay.  So you're generally familiar with the documents

25   that have been referred to in the pleadings filed by the

1    parties in this case.

2    A    I necessarily wouldn't say that.  I'm familiar with what

3    the exhibits are in here.  Some of the documents I'm familiar

4    with; some, I mean, I'm less familiar with.

5    Q    Okay.  Were you employed by the debtor at the time of

6    Alecto Sherman's purchase of the Sherman/Grayson Hospital?

7    A    I have never been employed by the debtor.  I was an

8    officer of the debtor at that time.

9    Q    Okay.  So you were an officer of the debtor.

10        Did you have any role with respect to Alecto Sherman or

11   with the Sherman/Grayson Hospital?

12   A    It depends on the time frame.

13        With respect to Alecto Sherman, yes, I was the Executive

14   Vice President of Alecto Sherman.

15   Q    Were you involved in the negotiation and documentation

16   of the transaction by which Alecto Sherman acquired the

17   Sherman/Grayson Hospital from a subsidiary of LHP Hospital?

18   A    Slight correction.  It wasn't the hospital, it was the

19   membership interest.

20        But yes, I was involved in that transaction.  I was

21   involved in the negotiation of the documents that consummated

22   that transaction.

23   Q    Okay.  So, if I turn your attention to Exhibit 11 in the

24   binder, which is the purchase agreement dated September 23rd,

25   2014, you're familiar with that document, correct?

1    A    I am familiar with it, yes.

2    Q    All right.  And in connection with that purchase,

3    Sherman/Grayson took an assignment of a ground lease and five

4    space leases in a medical office building, correct?

5    A    With respect to the five space leases, yes.

6         I don't recall whether the assignment of the ground

7    lease went straight to MPT of Sherman or it ran through

8    Sherman/Grayson Hospital.  But as it sits there today, the

9    ground lessor is an MPT entity.

10   Q    Okay.  So let's focus on the assignment of the five

11   leases in the medical office building.

12        I want to refer your attention to Exhibit 15 in your

13   binder.

14   A    Okay.

15   Q    And that's a document that's titled "Assignment and

16   Assumption of Leases," dated October 31st, 2014, correct?

17   A    Yes.

18   Q    So this is executed about six weeks after the purchase

19   agreement was signed that was contemplated at the time of

20   purchase, correct?

21   A    Yeah.  October 31st, 2014 was the day of the closing, so

22   it was --

23   Q    Okay.

24   A    The purchase agreement was signed before the closing

25   occurred.

1    Q    Okay.  Thank you.

2         And that's your signature on behalf of the assignee, the

3    Sherman/Grayson Hospital, on Page 5 of 8 of the document,

4    correct?

5    A    The 5 of 8 on top?  Yes, that's my signature.

6    Q    Okay.  And it says that you're an Executive Vice

7    President of Sherman/Grayson Hospital at that time.

8    A    No.  I was the Executive Vice President of Alecto

9    Healthcare Services Sherman --

10   Q    Oh, I see.

11   A    -- which was the sole member.

12   Q    Gotcha.  Okay.  Thank you.

13        All right.  And then the premises that were assigned to

14   Sherman/Grayson Hospital are listed on Exhibit A, correct?

15   A    Yes.

16   Q    And then Exhibit B is the schedule of guarantees,

17   correct?

18   A    That's what Exhibit B is, yes.

19   Q    And the guarantees that it's referring to are the

20   guarantees provided by LHP system -- LHP Hospital Group,

21   correct?

22   A    I believe so.  I'm -- I don't recall specifically what

23   LHP entity gave the guarantees.

24   Q    Okay.  And so let me refer you to -- now to the --

25   Exhibits 17, 18, 19, and 20 and 21, which I'll represent to

1    you are five separate lease agreements.

2              THE COURT:  Did you say Exhibits 17 through 21?

3              MR. SULLIVAN:  Yes.

4              THE WITNESS:  Okay.

5    BY MR. SULLIVAN:

6    Q    And do you recognize these as the lease agreements that

7    Sherman/Grayson Hospital took assignment of pursuant to the

8    assignment and assumption of the lease?

9    A    I just want to look at each one.  Hold on a second.

10        Yes, these are the leases that are referred to in -- was

11   it Exhibit 15 that we looked at?  Exhibit A, yes.

12   Q    Okay.  And Sherman/Grayson Hospital occupied the spaces

13   that it leases pursuant to the five leases for a period of

14   about six years.  Is that right?

15   A    That's not correct.

16   Q    Okay.  How long did Sherman/Grayson Hospital occupy the

17   spaces in the leases?

18   A    Some of the spaces were empty, they may still be empty

19   today.  Some of those spaces were then subleased to Sherman

20   MD Provider.  But a significant amount of the space was never

21   occupied.

22   Q    Okay.  Did there come a time when Sherman/Grayson

23   Hospital gave up the right to occupy those leases?

24   A    There was an agreed-upon judgment with re -- action

25   brought by the landlord with respect to possession.  I just -

1     - it's either 2020 or 2021.

2     Q     So let me turn you to Exhibit 22.

3     A     Okay.

4     Q     Is that the agreed judgment for possession that you've

5     referenced?

6     A     It is.

7     Q     Okay.  And then, if -- in the second paragraph of this -

8     - first of all, the date of the agreed judgment is on Page 3

9     of the document.  It's September 16th of 2020, correct?

10    A     Yes.

11    Q     Okay.  And it says "in order to" -- in the second

12    paragraph, it says:

13              "In order to resolve issues relating to the

14              possession of the leased premises, defendant has

15              agreed to pay plaintiff $100,000 on or before 5

16              p.m. Central Daylight Time on September 23rd, 2020,

17              in exchange for the right to surrender premises of

18              the leased premises as of 5 p.m. Central Daylight

19              Time on October 15th, 2020, and has further agreed

20              to surrender the leased premises as of September

21              24th, 2020, in the event that such payment is not

22              made."

23    Did I read that correctly?

24    A     You did read it correctly.

25    Q     Okay.  And is that the time frame when Sherman/Grayson

1    Hospital gave up possession of all five of the leased

2    premises covered by the five leases that we just referred to?

3    A    My recollection is that that October 15th date was

4    extended by two to four weeks, with an additional -- I

5    believe it was a fifty-thousand-dollar payment.  So there was

6    a -- like a two-to-four-week extension after that October 15,

7    2020 date that was agreed upon be -- by Sherman/Grayson

8    Hospital and the landlord.

9    Q    Is it fair to say that, by January 1st of 2021,

10   possession of the space -- spaces had been returned to the

11   landlord?

12   A    Yes.

13   Q    Did the return of possession to the landlord eliminate

14   Sherman/Grayson Hospital's obligation to pay rent?

15   A    I don't believe so.

16   Q    Did Sherman/Grayson Hospital make any rent payments

17   after it gave up possession of the premises?

18   A    Again, there was a -- I think a fifty-thousand-dollar

19   payment.  I don't recall the timing of that payment, but I

20   don't believe so, but I -- I don't know for sure.

21   Q    All right.  Well, let's restrict it to from January 1st

22   of 2021 to the -- to Sherman/Grayson Hospital's petition

23   date.

24        Did Sherman/Grayson Hospital make any of the monthly

25   payments of rent to the landlord under the leases?

1   A    I don't know for sure, but I don't believe so.

2   Q    Okay.  Now LHP Hospital sued the debtor and Alecto

3   Sherman from the Delaware Superior Court with respect to

4   unpaid amounts on those leased premises, correct?

5   A    I don't believe they sued for the unpaid amounts on the

6   leased premises.  They brought a claim for breach of contract

7   under the purchase agreement and a guarantee.  So I don't

8   necessarily know it was for the unpaid rent, technically.

9   Q    Well, the amount that they were claiming was the amount

10  of unpaid rent on those premises, correct?

11  A    No, that's not correct.

12  Q    Okay.  Let's look at Exhibit 10, which is the LHP

13  complaint filed on January 20th of 2021.  Do you see that?

14  A    Give me a second.  Okay.

15  Q    Okay.  Can I refer you to Paragraph 24?

16       (Pause in proceedings)

17  A    Okay.  And it says, Paragraph 24:

18            "As a result of Sherman/Grayson's defaults under

19            the lease agreements and Alecto Sherman's breaches

20            of the purchase agreement, LHP has been required to

21            pay Altera" --

22       Who is the landlord, correct?

23  A    Correct.

24  Q            "-- the following sums as of January 13th, 2021."

25       And it lists months paid and amounts.  Do you see that?

1   A    I see that.

2   Q    And those amounts, months paid and amounts, are amounts

3   that are due under the lease agreements that Sherman/Grayson

4   Hospital took an assumption of, correct?

5   A    I don't know that.

6       But your question was whether LHP sued us for the unpaid

7   rent.  LHP was not the landlord.  They sued us because they

8   alleged they paid these amounts, that's what they sued for,

9   the amounts they paid, not for the unpaid rent.

10      They didn't have a right to sue for the unpaid rent.

11  They had a separate action, they tried to do that and that

12  case got dismissed.

13  Q    Okay.  So it's fair to say that LHP sued you for amounts

14  that it paid to the landlord in its capacity as the guarantor

15  of the lease obligations for the five leases that

16  Sherman/Grayson Hospital took an assumption, right?

17  A    LHP sued based on allegations that they paid amounts to

18  the landlord under their guarantee, and they sued based on a

19  guarantee by the debtor, yes, and then a provision in the

20  purchase agreement by what I call "Alecto Sherman."

21  Q    Okay.  Now the lawsuit also included a counterclaim that

22  was made by Alecto Sherman relating to a net working capital

23  calculation.  Is that correct?

24  A    That's correct.  And other claims, as well.

25  Q    Okay.

1    A     But that was --

2    Q     All right.

3    A     -- the primary claim.

4    Q     Okay.  And all of the claims in that lawsuit were

5    settled under a settlement agreement, correct?

6    A     That's correct.

7    Q     Okay.  And that settlement agreement is attached as

8    Exhibit 12.  I'm going to ask you to take a look at that.

9          (Pause in proceedings)

10   A     Okay.

11   Q     And were you involved in the negotiation of the

12   settlement agreement?

13   A     I was involved in the negotiate -- the mediation that

14   resulted in the settlement.

15   Q     Okay.

16   A     And then I was involved in providing comments to

17   counsel.  I think LHP drafted the settlement agreement and we

18   provided comments and it -- they went back and forth.  I

19   didn't have direct communication with LHP or their counsel

20   about the terms of the settlement agreement, it was through

21   counsel.

22         The settlement was actually reached at a mediation

23   before Judge Rocanelli.

24   Q     But you were familiar with the negotiations, in your

25   capacity as an officer of the debtor and (indiscernible)

```
1    A    Yes.

2    Q    And you signed the agreement on behalf of all three

3    entities that are covered in the settlement agreement.  That

4    would be:  The debtor, Alecto Sherman, and Sherman/Grayson

5    Hospital.  Correct?

6    A    Yes.

7    Q    All right.  Now, if I'm looking at the signature on Page

8    9 of this document for Sherman/Grayson Hospital, LLC, it

9    lists you as executive vice president and does not indicate

10   that your signing it on behalf of its sole member, right?

11   A    (No verbal response)

12   Q    Was there a change in your position, so that you became

13   the Executive Vice President for Sherman/Grayson Hospital,

14   LLC?

15   A    Yeah, sometime in 2014, after the sale agreement.  When

16   the purchase was completed, I became the Executive Vice

17   President of Sherman/Grayson Hospital, LLC.

18   Q    Okay.  The -- I want to turn your attention to Paragraph

19   9 of the settlement agreement --

20   A    Okay.

21   Q    -- which is headed "Power to Confess Judgment."  Do you

22   see that?

23   A    I do.

24   Q    Okay.  Was there a confess judgment right in the leases?

25   A    I don't believe so, no.  I'd have to go back and look at
```

1    the leases.

2    Q    Okay.  Well, I'll represent to you that I looked for one

3    and couldn't find one.  Do you want to take a look and see if

4    there's a confess judgment right in the lease?

5    A    I didn't draft the leases, I didn't -- wasn't involved

6    when we took the leases over.  But I'm not arguing with you

7    that there is or is not.  I -- I just don't know as a

8    certainty.  I'd be surprised if there was.

9    Q    Okay.  So, with respect to the -- and this settlement --

10   that right to confess judgment relates to Paragraphs 6, 7,

11   and 8 of this agreement, which deal with future expenses,

12   correct?

13   A    Well, 6 -- 6 and 7.  8 is the forbearance period, so,

14   arguably, it could or could not.  But 6 and 7, definitely.

15   Q    Okay.  And so the power to confess judgment exists with

16   respect to the future obligations that both the Alecto

17   Defendants and Sherman/Grayson Hospital owe to LHP Hospital

18   Group, correct?

19   A    Well, may owe if certain conditions are met.

20   Q    What do you mean "may owe"?

21   A    Well, there's conditions that have to be met before

22   there's an obligation to pay under the settlement agreement.

23   Q    Okay.  So, with respect to the exercise of the power to

24   confess judgment, I think -- let me just read this.  It says

25   -- in the first paragraph of Paragraph 9, it says:

1                    "In the event that the future expenses are not paid

2                    in full with 15 days of notice from LHP to the

3                    Alecto Defendants and/or Sherman/Grayson of the

4                    amount due and subject to the provisions of

5                    Paragraph 68 of" -- "6 through 8 of this agreement"

6                    --

7          And then it goes on to say that the Alecto Defendants

8     authorize the confession of judgment against them, correct?

9     A    That's what it reads, yes.

10    Q    Okay.  And before they can exercise their right to

11    confess judgment against the Alecto Defendants, there's a

12    procedure that they have to follow outlined in Paragraph 6,

13    correct?

14    A    Well, I would say it's more than a procedure; it's a

15    condition precedent.

16         But Paragraph 6 relates to the Alecto Defendants, yes.

17    Q    Okay.  Well, let me just refer you to Paragraph 6 and to

18    the sixth line -- one, two, three, four, five -- sixth line

19    down that says:

20                   "Accordingly, the Alecto Defendants agree to the

21                   following procedure for payment of future

22                   expenses."

23         Did I read that correctly?

24    A    You read it correctly.

25    Q    Okay.  And then Subpart (a) says:

1          "LHP shall make a written demand upon the Alecto

2          Defendants for a specified amount in accordance

3          with the forbearance schedule set forth in

4          Paragraph 8."

5     Correct?

6   A    That's correct.  You read it correctly.

7   Q    All right.  And then Subpart (b) says:

8          "The Alecto Defendants shall make payment of the

9          specific amount within 15 days of such demand."

10    Correct?

11  A    You read it correctly.

12  Q    All right.  And then Paragraph (c) says that:

13         "If the Alecto Defendants dispute the amount, LHP

14         is entitled to the confession of judgment in the

15         form of Exhibit C hereto."

16    Correct?

17  A    There's some other language in there, but generally you

18  read it correctly.

19  Q    All right.  And then Subpart (d) says that:

20         "The only matter that the Alecto Defendants may

21         contest in connection with such proceeding is the

22         computation and payment of the principal, interest,

23         fees, and costs of the judgment.  All other

24         defenses are hereby expressly waived and disclaimed

25         by the Alecto Defendants, including, but not

```
 1                       limited to prior material breach, failure to

 2                       mitigate, unclean hands, offset, and failure to

 3                       state a claim."

 4            Correct?

 5     A      That's what it reads, correct.

 6     Q      Okay.  And then I want to turn your attention to Page 4,

 7     the following page, the first new paragraph, which says:

 8                       "LHP's obligation to pay Altera expenses only

 9                       occurs after Sherman/Grayson fails to meet its

10                       obligations."

11            Did I read that correctly?

12     A      Yes.

13     Q      Okay.  Now you indicated that there was a Texas action

14     where LHP had pursued Sherman/Grayson Hospital directly that

15     was dismissed.

16            And I want to refer you to the fifth whereas clause of

17     the settlement agreement.

18     A      Yes.

19     Q      And it says:

20                       "Whereas, in the Texas action, LHP seeks recovery

21                       of the current damages by way of a breach of

22                       contract claim against Sherman/Grayson, such claim

23                       being assigned to LHP by non-party Altera Highland,

24                       LLC."

25            Did I read that correctly?
```

1    A    You read it correctly.

2    Q    All right.  Have you ever seen an assignment from Altera

3    to LHP of the right to pursue claims against Sherman/Grayson

4    Hospital for breach of the lease agreement (indiscernible)

5    A    I believe there was a settlement agreement between LHP

6    Hospital and Altera that included an assignment.  That Texas

7    action, they sued as an assignee of Altera.  So I believe

8    there was a settlement agreement between Altera and LHP back

9    like in 2020 or 2021.

10   Q    And did that settlement agreement provide that LHP would

11   have an assignment going forward with respect to future

12   damages?

13   A    I don't -- I don't know.

14   Q    Okay.  Is it fair to say that Sherman/Grayson Hospital

15   made the payment required in the settlement agreement?

16   A    The settlement payment was made, yes.

17   Q    Okay.  After making this settlement agreement -- after

18   making the settlement payment -- and I believe that's

19   documented in the record at Exhibit 27.  Let's just look at

20   the date of that.

21        (Pause in proceedings)

22   Q    Okay.  The date on this is February 24th, 2022.

23   A    Yes.

24   Q    After making that payment, did Sherman/Grayson Hospital

25   make any other payments of the lease obligations up to and

1   including the petition date?

2   A    I don't believe Sherman/Grayson Hospital made any

3   payments of the lease obligations to the landlord.  No, I

4   don't believe that occurred.

5   Q    You said you don't remember.

6        Would you be in position to know if Sherman/Grayson

7   Hospital made payments to Altera or LHP under the lease

8   requirements?

9   A    I believe I said "I don't believe," rather that I don't

10  remember.  I don't believe that they made any payments.

11  Q    Okay.  All right.  So, with respect to the obligations

12  of Sherman/Grayson Hospital under the five leases, is it

13  correct that the obligations of Alecto Sherman arise from the

14  purchase agreement?

15  A    Obligations of Alecto Sherman to LHP?

16  Q    Yes.

17  A    They would arise under the purchase agreement, correct.

18  Q    Okay.  So let's just take a look at that briefly.

19       (Pause in proceedings)

20  A    What exhibit number, Mr. Sullivan?

21  Q    Exhibit 11.

22  A    Okay.

23  Q    And I'm looking at Page 46, Paragraph 9.3.

24  A    The numbers at the top, 46, right, or --

25  Q    I'm looking at the bottom.

| | |
|---|---|
| 1 | A    Okay. |
| 2 | Q    It's easier because the top are so (indiscernible) |
| 3 | A    Okay.  I got it. |
| 4 | MR. WAXMAN:  I'm sorry.  What page, Mr. Sullivan? |
| 5 | MR. SULLIVAN:  46.  Okay.  So -- |
| 6 | THE COURT:  I'm sorry, Mr. Sullivan.  Can you say |
| 7 | that again? |
| 8 | MR. SULLIVAN:  So I'm looking at Page 46 -- |
| 9 | THE COURT:  46.  Okay. |
| 10 | MR. SULLIVAN:  -- of the purchase agreement, using |
| 11 | the page numbers at the bottom -- |
| 12 | THE COURT:  Bottom.  Okay. |
| 13 | MR. SULLIVAN:  -- of the document -- |
| 14 | THE COURT:  Sorry. |
| 15 | MR. SULLIVAN:  -- not the -- |
| 16 | THE COURT:  I'm there. |
| 17 | MR. SULLIVAN:  -- not the -- |
| 18 | THE COURT:  Thank you. |
| 19 | MR. SULLIVAN:  -- court-stamped numbers. |
| 20 | BY MR. SULLIVAN: |
| 21 | Q    Okay.  And so Section 9.3 reads "Indemnification by the |
| 22 | Purchase," correct? |
| 23 | A    It does. |
| 24 | Q    And that's -- the purchaser is Alecto Sherman? |
| 25 | A    It is. |

1    Q    All right.  And it says:

2              "The purchaser shall indemnify and hold harmless

3              the seller, the seller guarantors, or any affiliate

4              of the seller guarantors."

5         And LHP is a seller guarantor, correct?

6    A    I believe they're defined as a seller guarantor, yes.

7    I'd have to ... yes, it is a seller guarantor.

8    Q    Okay.  And so -- and what it's indemnifying -- so Alecto

9    Sherman is indemnifying LHP from Items (a), (b), (c), (d),

10   and (e).  And I want to focus on E on Page 47, which says:

11             "Any liabilities related to the MOB" --

12        Which is medical office building.

13             "-- in respect of (i) seller's post-closing lease

14             obligations on the space of the leases or (ii)

15             LHP's guarantees of the ground lease and the space

16             leases."

17        Did I read that correctly?

18   A    You did.

19        But this was superseded by the terms of the settlement

20   agreement I think we looked at earlier.

21   Q    Okay.  Well, that -- I just ask you if I've -- if we've

22   read that correctly?

23   A    You read it correctly.  The document is the document, so

24   ...

25   Q    Okay.  And so that Section 9.3(e) was the basis that LHP

1    sued Alecto Sherman in the Delaware Superior Court, correct?

2    A    That was the basis of the lawsuit, generally, yes.

3    Q    Okay.

4              MR. WAXMAN:  Your Honor, Jeff Waxman, Morris James,

5    on behalf of the debtor.

6              THE COURT:  Mr. Waxman, I think we're not picking

7    you up.  Sorry.

8              MR. WAXMAN:  Is this better?

9              THE COURT:  Yes.

10             MR. WAXMAN:  Okay.

11             THE COURT:  Thank you.

12             MR. WAXMAN:  Thank you.

13             Your Honor, I don't mean to interject myself into

14   Mr. Sullivan's direct, but I think we're kind of running far

15   afield.

16             I think the debtor is willing to stipulate that it

17   was liable for obligations to LHP under the guarantee and the

18   purchase agreement originally.  But all of that, as Mr.

19   Sarrao alluded to, was superseded by the settlement

20   agreement.  And we've been at it for 45 minutes,

21   approximately, and I don't know that any of this line of

22   inquiry is relevant, considering that all of the liabilty has

23   -- under the purchase agreement, at lease, again, is

24   superseded by the subsequent agreement between the parties.

25             Again, if Mr. Sullivan wants to continue his

1   direct, that's fine.  But time is running, Your Honor, and I

2   just don't know what any of this is necessarily relevant to

3   the issues immediately before the Court.

4           MR. SULLIVAN:  Your Honor, I guess Mr. Waxman has

5   now made his opening statement that he said he didn't need to

6   make.  That's not an objection to my question.

7           I'm going through the underlying documents that

8   relate to the LHP claim.  And they've stated a legal position

9   that may or may not be relevant to Your Honor's

10  consideration, so they can make it when they need to make it.

11  I respectfully -- you know, I'm two-thirds of the way through

12  what I had planned to ask this witness, but I believe it's

13  appropriate to go through the documents that underlie these

14  claims.

15          THE COURT:  Okay.  You may proceed.

16          MR. SULLIVAN:  Thank you, Your Honor.

17  BY MR. SULLIVAN:

18  Q    Now, with respect to the obligations of the debtor to

19  LHP, those obligations are governed by the guarantee, which

20  is shown at Exhibit 14.

21  A    Well, they were.  And then, from my perspective, they

22  were modified by the terms of the settlement agreement.

23  Q    Okay.  So let's focus on, first of all, at the time that

24  we get to -- at the time that LHP sued the debtor in the

25  Delaware Superior Court, their allegations against the debtor

1  and the debtor's liability for the claims they made in their

2  complaint that we looked at earlier are based on this

3  guarantee, correct?

4  A    Correct.  It was a breach of contract claim.  And the

5  contract they alleged that was breached was the guarantee.

6  Q    Okay.  And this guarantee in Paragraph 2(a) states that

7  it's a guarantee that -- it's an unconditional guarantee of

8  payment and performance and not of collection, correct?

9  A    That's what the document says, yes.

10  Q    And in Section 2(b), starting at Line 7, it says:

11          "The guarantor agrees that the obligation of the

12          guarantor hereunder shall not be released or

13          discharged in whole or in part or otherwise

14          affected by the failure of the guarantee parties to

15          assert any claim or demand or to enforce any right

16          or remedy against or to join purchaser to any suit

17          arising under the guarantee."

18      Correct?

19  A    That's what the guarantee says, correct.

20  Q    Okay.  And it also -- if we turn to Page 2 of the

21  guarantee, I'm going to say about the fifteenth line down,

22  there's a sentence that begins on the far right with "the,"

23  and it says:

24          "The guarantor waives promptness, diligence, notice

25          of the acceptance of his guarantee and of the

1              obligations, presentment, demand for payment,

2              notice of nonperformance, default, dishonor, and

3              protest, notice of any obligations incurred, and

4              all other notices."

5       Did I read that correctly?

6    A    I believe so, yes.

7    Q    Okay.  And is it fair to say that Alecto Sherman has no

8    independent operations?

9    A    Alecto Sherman serves -- I guess "independent

10   operations" is what I'm struggling with.  It serves as a

11   parent company of Sherman/Grayson Hospital, LLC and then

12   Sherman/Grayson Sponsor, LLC, which has some operations.  So

13   it doesn't do anything.  It just holds as a -- it's a holding

14   company, effectively.

15   Q    Right.

16       But if there's money to pay lease expenses, it's either

17   going to come from Sherman/Grayson Hospital's operations or

18   from the debtor, correct?

19   A    No, that's not correct.

20   Q    Okay.  Does Sherman -- does Alecto Sherman have any

21   financials that are not related to the subsidiaries?

22   A    Well, again, there's other subsidiaries other than

23   Sherman/Grayson Hospital.  There's Sherman M.D. Provider and

24   Sherman Anesthesia --

25   Q    Okay.

1   A     -- which are two different entities, and they each have

2   collections and revenue.

3   Q     Okay.  So Sherman -- if Sherman Alecto -- if Alecto

4   Sherman wanted to pay the lease expenses, they would have to

5   get the money from one of the subsidiaries -- one of its

6   subsidiaries or from its parent, correct?

7   A     Or a different -- or a different affiliate, correct.

8   Q     Okay.

9         (Pause in proceedings)

10  Q     So, under the purchase agreement, did it provide for

11  procedures for LHP and other indemnified parties to seek

12  indemnification and payment?

13  A     There's indemnification provisions.  I'd have to go back

14  and look at them, but it's -- I think there's two or three

15  pages that deal with indemnification.

16  Q     Well, let me -- on Exhibit 11, which is the purchase

17  agreement, let me focus your attention on Page 48.

18  A     Okay.

19  Q     Do you see that Section 9.5 is headed "Claims

20  Procedures"?

21  A     I do see that.

22  Q     And Subsection (a) says:

23              "If a party seek indemnification for damages

24              hereunder, the party seeking indemnification shall

25              notify the party from whom the indemnification is

1              sought."

2    A    I see that.

3    Q    All right.  And then the -- and then procedures flow

4    from that.

5    A    Correct.

6    Q    Okay.  Now the documents that have been submitted to the

7    Court as joint exhibits include payments that LHP made to

8    Altera Highland for the lease obligations of Sherman/Grayson

9    Hospital, correct?

10   A    They show payments.

11        I don't -- I'm assuming they're LHP Hospital that made

12   the payments, but I can't tell because the account number is

13   redacted.

14        Ardent -- Ardent is, I think, the parent company of LHP

15   now; they merged or there was a transaction.  So I'm not sure

16   what entity made the payment.  But clearly, they show

17   payments being made to Altera Highland.

18   Q    Okay.  So let's just -- so that the record is not

19   confused by this, let's look -- let's just refer to one of

20   the payments.  And let's -- I want to refer you to Exhibit

21   46.

22        (Pause in proceedings)

23   Q    Okay.  So let's just take a look at Exhibit 46.  And

24   it's a four-page -- actually, a five-page document.

25        And the first page is a Bank of America wire form,

1    correct?

2    A    Again, I'm not sure if it's a Bank of America wire form.

3    I think it's a -- in my experience, this is probably a wire

4    form that perhaps Ardent or LHP had for Bank of America.

5        I don't know what Bank of America wire forms look like.

6    The first time I saw this was on Saturday.

7    Q    Okay.  So the date of this Exhibit 46 is March 1st,

8    2022, correct?

9    A    That's correct.

10   Q    And the description is "Altera Highland lease payment."

11   Is that correct?

12   A    That's correct.

13   Q    All right.  And the amount of the payment is

14   $226,526.68.  Do you see that?

15   A    I do.

16   Q    All right.  And do you understand that to be the monthly

17   payment that Sherman/Grayson Hospital owes to Altera under

18   the lease agreements that it took an assumption on?

19   A    No.  I understand that to be the payment of the invoice

20   that's the second page of this directed to Sherman/Grayson

21   Health System, not Sherman/Grayson Hospital.  And it's rent

22   and it's estimated CAM charges.

23   Q    Okay.  So these are -- Page 2 is the tenant statement,

24   and it says "prepared for Sherman/Grayson Health System,"

25   which is actually the predecessor, correct?

1   A    No.  Sherman/Grayson Health System -- when you say

2   "predecessor," I'm not sure what you mean.

3   Q    That's L -- Sherman/Grayson Health System was the

4   seller.

5   A    Correct.  It's an LHP entity.

6   Q    Right.

7        So the landlord never changed the documentation, despite

8   the assignment and despite the consent to assignment.

9   A    I don't know what the landlord -- this isn't the

10  landlord; this is a management company.  I don't know what

11  the landlord did or didn't do.

12  Q    Okay.  So the management company, operating for the

13  landlord, didn't change who it's for.  But we can agree that

14  Sherman/Grayson Health Systems was the seller who sold to

15  Alecto Sherman and then assigned the leases to

16  Sherman/Grayson Hospital.

17  A    Yes, we ca agree to that.

18  Q    Okay.  And the statement is for the monthly amounts due

19  under the leases for March of 2022, correct?

20  A    At least what the landlord says is due, correct.

21  Q    Okay.  And then attached is an email chain, on Pages 3,

22  4, and 5.  And the second email in the chain is an approval

23  from Steve Hinkle, who is identified as the VP and Chief

24  Compliance Officer for Ardent Health Services, correct?

25  A    That's what the email says, yes.

1   Q    Right.

2        And Ardent is affiliated with LHP.

3   A    Yeah.  I'm not sure of the exact -- my recollection is

4   that Ardent is a -- the parent company of LHP.  There was

5   some -- there was a transaction, I think it -- I don't know

6   if it was called a merger or an acquisition, but they're

7   related.  Ardent and LHP are related.

8   Q    And the beginning -- if -- going to Page 4 of the

9   exhibit, the initial email was dated January 25th, 2022.

10  That was forwarding the February statement.  And that was

11  from Andriana Santos (phonetic) at Borum Property Apartments

12  (phonetic), correct?

13  A    That's correct.

14  Q    Okay.  And so the initial email on January 25th

15  forwarded the tenant statement for February 2022.

16       And then, two emails up, there's an email dated March

17  1st from Glynda McDaniel at Ardent Health saying we haven't

18  received the invoice, please forward it.  And then it gets

19  paid, correct?

20  A    Yeah.  There's an email between Glynda McDaniel and

21  Andriana Santos, and there's some internal emails that Ardent

22  -- correct.

23  Q    Okay.

24  A    And --

25  Q    All right.

1   A    -- I assume that that wire went through.  This is a wire

2   form we have.

3   Q    Did you look at the other exhibits that are similar with

4   the wires and the backup information that are -- follow

5   Exhibit 46 and run to Exhibit 66?

6   A    Yeah, I reviewed them for the first time on this past

7   Saturday morning, the first time I saw them.

8   Q    Okay.  I'm going to provide you with a summary of the

9   payments and those invoices.

10          MR. SULLIVAN:  And I believe, Your Honor, we agreed

11   to mark this as Exhibit 67.

12          (Participants confer)

13          MR. SULLIVAN:  Your Honor, may I approach the

14   witness?

15          THE COURT:  Yes.

16   BY MR. SULLIVAN:

17   Q    Mr. Sarrao, I'll represent to you that Exhibit 67 is a

18   chart, it's titled "LHP Payments to Altera Highland, 2/17/22

19   to 11/1/23."  And it lists the -- in three columns, the Bates

20   Number for the documentation provided in the exhibit binder,

21   the date of the payment referenced in each of the exhibits,

22   and the amount of the payment, with a total at the bottom and

23   a subtotal on the right.  Do you see that?

24   A    I do see that.

25   Q    Okay.  And then assuming that this is correctly listed

1    here in the amount, the subtotal through the petition date of

2    payments between February 17th, 2022 and June -- and the

3    petition date is $3,708,475.62, correct?

4    A    Yeah.  Assuming those numbers add up to that, yeah.  I

5    obviously can't do that in my head, but I'm not -- it looks

6    like an Excel spreadsheet and it looks --

7    Q    And the numbers that are shown for each monthly amount

8    are in the correct range of the monthly rent obligations that

9    Sherman/Grayson Hospital has under the leases --

10   A    Well, there's --

11   Q    -- correct?

12   A    There's the rent and then there's the estimated CAM

13   fees; and, when you combine the two, they're in -- in that

14   amount.  There's variations from month to month and I think

15   some of that relates to CAM fees.

16   Q    Okay.  So the general scope of this amount you're not

17   disputing.

18   A    Again, assuming that -- I could go through and add them

19   up.  I -- I'm not questioning that you entered in each one

20   and added them up.  Correct.

21           MR. SULLIVAN:  Okay.  Bear with me one second, Your

22   Honor.

23           THE COURT:  Certainly.

24       (Pause in proceedings)

25   BY MR. SULLIVAN:

1    Q    Mr. Sarrao, let me turn to you Exhibit 24, which is the

2    Sherman/Grayson schedules.

3    A    Okay.

4    Q    I want to refer you to Exhibit G.

5    A    Do you know what page that is, Mr. Sullivan?

6    Q    I'm working on -- I'm working on it.

7    A    Okay.  Sorry.  I ...

8    Q    So Exhibit G starts at Page 110 of 132.  But I --

9    A    Okay.

10   Q    -- want to focus you on Page 116 of 132.

11   A    Okay.

12   Q    And do you see Items 2.54 through 2.58?

13   A    I do.

14   Q    It lists the five leases that we've been discussing and

15   that are referenced in the exhibit binder, correct?

16   A    I see that.

17   Q    All right.  And to your knowledge, has Sherman/Grayson

18   Hospital taken any action with respect to those leases?

19   A    Yes.  There has been discussion between counsel for

20   Sherman/Grayson Hospital and counsel for LHP about those

21   leases being assigned to LHP.  And there's also, in the

22   Sherman/Grayson Hospital case -- it's a bit different of a

23   case and lots of things going on -- there's discussion about

24   -- there was discussion about rejecting those leases in that

25   case, as well.

1    Q    But nothing has happened to date, correct?

2    A    I don't know for sure.  I don't believe so.

3    Q    Okay.

4    A    And the discussions have taken place between counsel for

5    Sherman/Grayson Hospital and counsel for LHP about assigning

6    those leases to LHP.  Those discussions have taken place.

7    The actual assignment I don't believe has occurred yet.

8    Q    All right.  So the lease -- as it currently stands,

9    those lease obligations remain the obligation of

10   Sherman/Grayson Hospital, correct?

11   A    Correct.

12        I don't know what those lease obligations are currently

13   because of re-letting, and I think there's a lease to one

14   tenant that came in --

15   Q    All right.

16   A    -- that took up some of the space.

17   Q    All right.  Let me refer you to -- back to Exhibit B.

18   A    On 24?

19   Q    Yep.

20   A    Okay.

21   Q    So it's Page 36 of 132.

22   A    Okay.

23   Q    And Item 3.18 is -- lists as a creditor Altera Highland,

24   LLC, who is the landlord for the leases we just discussed,

25   correct?

1   A    Yes.

2   Q    And it lists the amount due as of the petition date as

3   zero.  And then it identifies it as contingent and disputed.

4       Can you tell me why that amount is listed as zero and

5   identified as contingent and disputed?

6   A    Because, one, we didn't know what, if anything, was owed

7   to Altera Highland, LLC because we didn't receive those --

8   any invoices.

9       Disputed because there's a question or not about --

10   there's at least one tenant that came in and took some of the

11   space.

12       Three, it's disputed because Altera Highland has

13   obligations to mitigate their damages, and certainly don't

14   know if they've actually mitigated their damages.

15   Q    Well, didn't you waive any claim for mitigation of

16   damages in the settlement agreement with LHP?

17   A    Not as against Altera Highland we didn't.  This is a

18   claim by Altera Highland, which is the landlord.

19   Q    So, with respect to the settlement agreement that we

20   reviewed, Section 6(d) ...

21       (Pause in proceedings)

22   Q    I want to refer you on -- to Exhibit 12, Page 3.

23   A    Okay.

24   Q    With respect to claims brought by LHP against the

25   debtor.

1           MR. WAXMAN:  I'm sorry.  Which paragraph?

2           MR. SULLIVAN:  6(d).

3           MR. WAXMAN:  Gotcha.

4   BY MR. SULLIVAN:

5   Q    Is it correct to say that the debtor has expressly

6   waived all defenses it could assert against LHP, including

7   failure to mitigate?

8   A    Well, I don't know about "all defenses," but failure to

9   mitigate is there as against LHP.  The claim we looked at was

10  Altera Highland, LLC, two different entities --

11  Q    Okay.

12  A    -- two different parties.

13       (Pause in proceedings)

14  Q    Does -- having now seen the exhibits showing the

15  payments that LHP has made to Altera Highland, does the

16  debtor dispute the amounts that are owed to LHP, as set forth

17  in the LHP group of claims?

18  A    Yes, because a condition precedent to those obligations

19  has not been met.

20       We have a question about whether Altera Highland is

21  charging LHP the right amount because there's at least one

22  tenant that I'm aware of that came in as a subtenant and --

23  and paid rent to Altera Highland.

24       Whether LHP paid the money, this is the first time I'm

25  seeing it.  The first time I saw it was on Saturday.  There's

1    wire forms from the -- well, I assume the wires went out and

2    they paid it.  But there are certain conditions precedent to

3    those obligations that have not been met.

4    Q    And what are the conditions precedent to those

5    obligations that have not been met?

6    A    There has to be a demand for payment and there has not

7    been a demand for payment against the debtor.

8    Q    And in your mind, does a proof of claim constitute a

9    demand for payment?

10   A    I don't -- I don't know.  That would be a legal question

11   I haven't really thought about.

12            MR. SULLIVAN:  Okay.  That's all the questions I

13   have, Your Honor.

14        (Pause in proceedings)

15            MR. SULLIVAN:  I'm sorry, Your Honor.  There are a

16   lot of documents.  If I could just have a moment to get set

17   up.

18            THE COURT:  No, that's okay.

19            THE WITNESS:  Is it --

20            THE COURT:  I'm --

21            THE WITNESS:  -- possible --

22            THE COURT:  -- assuming --

23            THE WITNESS:  -- Your Honor --

24            THE COURT:  -- you guys are going to confer and

25   move in evidence at the end.  Is that accurate?

1          MR. WAXMAN:  I think that's correct --

2          THE COURT:  Okay.

3          MR. WAXMAN:  -- Your Honor.

4          THE COURT:  That's --

5          MR. WAXMAN:  We still haven't discussed the

6     demonstrative exhibits, 1 and 67, at this point.  But I'm

7     sure Mr. Sullivan and I will discuss it.

8          THE COURT:  Okay.

9          THE WITNESS:  Your Honor, is it possible -- I left

10    a water bottle there.  Can I just grab it off the first row?

11         THE COURT:  Mr. Waxman will get it for you.

12         THE WITNESS:  Okay.  Thank you.

13         MR. WAXMAN:  If I may approach, Your Honor?

14         THE COURT:  Certainly.

15         THE WITNESS:  Thank you.  Thank you, Your Honor.

16        (Pause in proceedings)

17                          CROSS-EXAMINATION

18    BY MR. WAXMAN:

19    Q    I'm going to bypass some of the preliminary questions

20    with respect to your background and your involvement.  Mr.

21    Sullivan has already addressed those with you.

22        But I do want to go back to the underlying settlement

23    agreement, which I believe is Exhibit 12.

24    A    Okay.

25    Q    You were involved with that settlement?

1    A     I was.

2    Q     How were you involved with the drafting or negotiation

3    of the settlement?

4    A     The actual settlement, the terms of the settlement were

5    reached as part of mediation, and then drafts of the

6    settlement agreement went back and forth.  Our counsel would

7    get it, I'd provide comments to our counsel.  We would see a

8    revised draft.  I think there were two or three turns of a

9    draft of the agreement.  And then I signed the agreement.

10   Q     So you were very involved with respect to the

11   settlement, right?  Fair?

12   A     Yes.

13   Q     Was it your understanding that the settlement agreement

14   superseded the obligations, the debtor's obligations, under

15   the guarantee?

16          MR. SULLIVAN:  Objection.  General, seeks a legal

17   conclusion.

18          MR. WAXMAN:  I'm asking his understanding.  He was

19   the -- he helped negotiate it, he signed it.  If there's

20   anybody who's familiar with what it was intended to do, it

21   would be Mr. Sarrao.

22          MR. SULLIVAN:  It's stated as a complete general --

23   without specificity about what (indiscernible)

24          THE COURT:  I'm sorry, Mr. Sullivan.  I'm having

25   trouble hearing you.

1          MR. SULLIVAN:  Oh, I apologize.

2          The objection is that the question goes to a legal

3     conclusion about two documents in their entirety.  So I think

4     this witness may not be qualified to answer the ultimate

5     question of a legal nature.

6          MR. WAXMAN:  Your Honor, this was -- first of all,

7     Mr. Sarrao was counsel and he was -- helped negotiate it and

8     he signed it.  As an officer and general counsel of the

9     company.  If there's anybody who understands what I was

10    intended by the parties, this is the witness who would do so.

11         THE COURT:  Yeah.  I'm going to overrule the

12    objection.  He can testify to his understanding.

13         THE WITNESS:  Yes, that was my understanding and

14    it's included in the language of the document, as well.

15    BY MR. WAXMAN:

16    Q    I'm going to refer you to Paragraph 19 of the agreement.

17    A    Okay.

18    Q    This --

19         THE COURT:  Oh, are we talking about the settlement

20    agreement?

21         MR. WAXMAN:  Yes.

22         THE COURT:  Okay.

23         MR. WAXMAN:  Yes, Your Honor, which is Exhibit 12.

24    BY MR. WAXMAN:

25    Q    Can you please read that for the Court?

1    A    Okay.  It starts with 19:

2              "Entire Agreement.  This agreement and the exhibits

3              attached hereto set forth the entire agreement

4              between the parties and fully supersede any and all

5              prior agreements or understandings, written or

6              oral, between the parties."

7    Q    Okay.

8    A    And then it --

9    Q    You can --

10   A    -- goes on about --

11   Q    You can stop.

12   A    -- counterparts and --

13   Q    You can stop.

14        So, based upon that, all of the company's obligations,

15   as you understood it, ran through this agreement, correct?

16   A    Correct.

17   Q    In connection with the settlement, was anybody other

18   Alecto -- by that, I mean the debtor -- responsible for

19   payments to LHP?

20   A    Yes.  There is Alecto Healthcare Services Sherman, LLC

21   and Sherman/Grayson Hospital, LLC.

22   Q    And either one of those entities could have remitted

23   payment to LHP, correct?

24   A    They could have, yes.

25   Q    And what would the effect of that have been on the

1   debtor's operations?

2   A    It would have reduced -- it -- depending on the amount

3   of the payment, it would have reduced or eliminated the

4   obligation, the monetary obligation.

5   Q    On a dollar-for-dollar basis?

6   A    Yes.

7   Q    Was the debtor automatically obligated to make all

8   payments to LHP?

9   A    No.

10  Q    And what are you basing that answer on?

11  A    We looked at -- I think we looked at it with Mr.

12  Sullivan.  If we look at Paragraph 6 of the settlement

13  agreement, there is a -- conditions that have to be met.

14  Q    And that would be the written demand and then the timing

15  for the 15 days for payment?

16  A    Correct.

17  Q    At -- before we move on, I want to move to Paragraph

18  6(a) as in apple.  Can you read 6(a), please?

19  A        "LHP shall make written demand upon the Alecto

20           Defendants for a specified amount in accordance

21           with the forbearance schedule set forth in

22           Paragraph 8."

23  Q    "Specified amount."  I want to talk about that for one

24  second because there could have been specific amounts, at

25  least in theory.

```
 1          Did the amounts, month by month, under -- with -- of the
 2     obligations to LHP?
 3     A    Some -- well, the -- the rent under the leases had
 4     slight increases, so it changed month to month.  And then the
 5     records LHP produced show that there's a fluctuation in the
 6     amounts, yes.
 7     Q    What are the components for the underlying obligation --
 8     the underlying obligations under the lease?
 9     A    There's the base rent and there's also CAM charges, or
10     the percentage of CAM charges assigned to each lease.
11     Q    All right.  I want to refer you to -- and give me just
12     one second here.  I apologize.
13          (Pause in proceedings)
14     Q    I'm just going to ask you to turn to para -- Document
15     Number 45.
16     A    Okay.
17     Q    And I'm ask -- and please turn to Page 2.  That's the
18     underlying tenant statement.
19     A    Okay.
20     Q    What is -- what's the first line?  We'll start off with
21     the first line.  It's $19,221.
22     A    That's -- my understanding is that's the -- that would
23     be the base rent.  It's a rental rate times the square
24     footage of the space.
25     Q    Okay.  What's the line after that?
```

1    A     It's the estimated CAM charge for that lease.

2    Q     Okay.  Just looking down this one sheet, you'll see five

3    rents and five estimated CAM charges.  Is that correct?

4    A     That's correct.

5    Q     Okay.  What is the -- let me back up.

6          The estimation.  Was there a subsequent true-up that was

7    done in connection with the underlying leases for that CAM

8    charge?

9    A     Yeah, there's a -- there's a -- there is a -- there is a

10   true-up, there's a mechanism for a true-up in the leases.

11   And in the documents that I saw just last -- you know, I

12   guess Saturday, I said -- there are some letters in there

13   about a true-up like for 2020 and 2021.

14         But there's a true-up each year because they're

15   estimates is what you're paying, and then there's a true-up

16   against that.

17   Q     So why didn't the settlement agreement specify the

18   amount of the claim, rather than having the specific amount

19   (indiscernible)

20   A     Because we didn't know what -- we didn't know what the

21   amount of the claim is because the CAM charges are estimated.

22         We don't know what's going to happen with respect to re-

23   letting the premises, as well, and it's -- it's variable.

24   Q     And after the settlement agreement was reached and the

25   payment was made, did you receive any demand from -- did

1    Alecto Healthcare, the debtor, receive any demand from LHP

2    prior to the petition date?

3    A    The debtor did not receive any demand.

4    Q    Is there any way, without that demand, that you could

5    have realized -- that you could have known the total amount

6    of the rent, including the CAM charges?

7    A    No.

8    Q    Having had a chance to review, since that point, the

9    underlying invoices that were provided by LHP, do you have an

10   estimate as to the percentage of what the CAM charges are

11   relative to the amount of the base rent?

12   A    Well, the -- of the total amount, it's about 30 -- it's

13   about 35 percent.

14        So like, if we're looking at this invoice, it's right

15   around eighty-three or $84,000.  So, of the total -- of the

16   total invoice -- and this one would have been covered by the

17   settlement.  But it's like $84,000 of the total -- the

18   balance -- the total due was two twenty-six and about eighty-

19   three or $84,000 was the CAM charges, so about 30 -- 30

20   percent of those --

21   Q    All right.

22   A    -- maybe a little --

23   Q    Let's --

24   A    -- bit more.

25   Q    Let's move to one that's afterwards, to make sure that

1    we're talking about something which is relevant.  Let's move

2    to Exhibit 49.

3    A    Okay.

4    Q    And I'd ask you to look at the second page.

5         And is this approximately the same thing as with Exhibit

6    46?

7    A    Correct.  The amount is slightly less, but the overall

8    CAM charges are roughly the same number.  So whatever eighty-

9    three or 84,000 divided by two twenty-five is.

10   Q    And again, this is after the settlement agreement,

11   correct?

12   A    Correct.  The settlement agreement was in February of

13   2022.

14   Q    So this is more reflective of what the underlying

15   amounts were.

16   A    Correct.

17   Q    Who would have received the demand notices from LHP?

18   A    They would have been sent to -- to Alecto, to my

19   attention as the general counsel, and then to our counsel in

20   Texas, our local counsel in Texas, Hallett & Perrin.  That's

21   per the confidential settlement agreement.

22   Q    And would counsel have sent it to you?

23   A    Yes.

24   Q    And did you receive anything prior to the petition date?

25   A    No.

1    Q     Did you receive anything after the petition date?

2    A     For the debtor, no.

3    Q     Who did you receive it for?

4    A     There was a demand to Alecto Healthcare Services

5    Sherman, LLC in late June, I think the 28th or 29th.

6          MR. WAXMAN:  If I could have just one moment, Your

7    Honor.  I'll have to get back to it in a moment.

8    BY MR. WAXMAN:

9    Q     Prior to that July -- June 28th or 29th letter, did you

10   or anybody else at the debtor have any reason to know the

11   amount due to LHP?

12   A     No.

13   Q     What's the current status of the underlying properties?

14   A     They're -- I mean, the building still -- the building

15   still exists, the building is still there.  Sherman/Grayson

16   Hospital doesn't occupy space.  I know Sherman M.D. Provider

17   doesn't.

18         So the building, roughly about 75 percent is covered by

19   these leases and 25 percent was not covered by these leases,

20   so there are some tenants in there.

21         I think there's one tenant -- I don't know if they're

22   still there or not -- that was brought in as a sub-lessee of

23   Sherman M.D. Provider, I think.  And then they ended up

24   paying rent directly to Altera.  I don't know if that tenant

25   is still there.

1          But a lot of the space is still -- as I understand it,

2     is empty.

3     Q    So, if the property is laying fallow, so to speak, at

4     any given time, there could be new tenants that move in,

5     correct?

6     A    Correct.

7     Q    And if that were the case, what would that do to the

8     debtor's and, in fact, all of the purchasers' liabilities?

9     A    It -- it would reduce it.

10    Q    Do you know if LHP has pressed the landlord about

11    mitigation of damages through re-letting?

12    A    I don't know if they've had any discussions with the

13    landlord.

14         (Pause in proceedings)

15    Q    Did anybody from LHP contact you immediately after

16    filing?

17    A    No.  Their counsel may have contacted counsel, but not -

18    - certainly not me.

19    Q    So you would not have had a reason to know what the

20    amount was even after the petition date, until June -- the

21    June 28th letter.  Is that correct?

22    A    That's correct.

23              MR. WAXMAN:  If I could have just one moment, Your

24    Honor.

25         (Pause in proceedings)

```
 1              MR. WAXMAN:  Your Honor, I don't believe I have
 2      anything further --
 3              THE COURT:  Okay.
 4              MR. WAXMAN:  -- for Mr. Sarrao.
 5              THE COURT:  Thank you.
 6              Mr. Sullivan?
 7              MR. WAXMAN:  Before I -- I do reserve the right to
 8      recall Mr. Sarrao on direct, Your Honor.
 9              MR. SULLIVAN:  Briefly, Your Honor.
10              Mr. Sarrao, let me --
11              THE COURT:  Wait.
12              MR. SULLIVAN:  -- refer you --
13              THE COURT:  So can -- before we start -- I'm sorry,
14      Mr. Sullivan.
15              Are you taking the position that what you just did
16      was the debtor's direct exam of Mr. Sarrao?
17              MR. WAXMAN:  That was the cross-exam -- sorry.
18      That was the debtor's cross-examination, after the Reed
19      Creditors did their direct.
20              THE COURT:  Okay.  I was wondering --
21              MR. WAXMAN:  That was called by Mr. Sullivan as
22      part of his case-in-chief.
23              THE COURT:  Okay.  I -- that's how I understood it,
24      and then I was confused by your comment.
25              MR. WAXMAN:  No, that -- Your Honor, we're
```

1    reserving our right to call him on -- as direct.  I don't

2    think it will be necessary, but ...

3                         REDIRECT EXAMINATION

4    BY MR. SULLIVAN:

5    Q    Mr. Sarrao, let me refer you to the settlement agreement

6    that you were talking about with your counsel, which is

7    Exhibit 12.

8    A    Okay.

9         (Pause in proceedings)

10   Q    So there are two release provisions contained in this

11   agreement, correct?

12   A    (No verbal response)

13   Q    Paragraphs -- I'm referring to Paragraph 3 and Paragraph

14   4.

15   A    That's correct.

16   Q    Okay.  So Paragraph 3 is an LHP release, where it

17   releases Alecto, right?

18   A    And a bunch of other affiliates and parties and all the

19   standard release language you have, yes.

20   Q    But for purposes of this matter, let's just restrict it

21   to the debtor.

22        And the scope of -- what it's being released from is

23   generally defined on Page 3, in the third line, right?  It's

24   the Delaware action and the current damages in the Texas

25   action, correct?

1   A    Correct.

2   Q    And then it says, right after that, that future expenses

3   are excluded from the release, correct?

4   A    That's correct.

5   Q    All right.  And then the debtor also made a release, and

6   it released claims against LHP from the debtor act -- from

7   the Delaware action and the Texas action, including a

8   counterclaim that was made in the Delaware action, correct?

9   A    That's correct.

10  Q    All right.  Is it your contention that Paragraph 19,

11  which is identified as entire -- the "entire agreement

12  clause," that that supersedes and eliminates the purchase

13  agreement?

14  A    It supersedes any and all prior agreements or

15  understandings.  It doesn't limit it to anything, so yes.

16  Q    So it's your opinion that this entire agreement clause

17  releases any obligations under the purchase agreement.

18  A    Yes.

19  Q    And also -- and that's -- the purchase agreement is

20  Exhibit 11.

21       And then Paragraph 14, the guarantee.  It releases the

22  guarantee?

23  A    Yes.

24  Q    And Paragraph 15, the assignment and assumption of

25  leases.  It releases those?

1    A     Exhibit --

2    Q     The assignment -- does it release the assignment and

3    assumption of leases?

4    A     Releases -- it --

5    Q     Okay.

6    A     -- supersedes all the agreements, so that it would

7    supersede that, yes.

8    Q     Okay.  And does it say that anywhere in there --

9    A     Yeah.

10   Q     -- (indiscernible)

11   A     It says:

12              "-- supersede any and all prior agreements or

13              understandings, written or oral, between the

14              parties."

15   Q     Okay.  It doesn't say -- it doesn't reference any

16   specific agreement that is now nullified, correct?

17   A     Correct.

18        And likewise, it doesn't limit to a subject matter or a

19   topic, either.

20   Q     Right.  And in your experience, isn't this clause

21   generally incorporated to prevent drafts or discussions of an

22   agreement from being relied on when you get to a final

23   agreement?

24   A     There's all kinds of reasons this provision is included.

25   And if you wanted to rely on it and relate it to a

1    settlement, then you typically add a phrase any and all prior

2    agreements or understandings, written or oral, between the

3    parties related to the topic of this agreement.   That's not

4    here.

5         My understanding was they were resetting the

6    obligations.   LHP got more than they had.

7    Q    What do you mean "LHP got more than they had"?

8    A    Well, prior to the settlement agreement, they didn't

9    have an ability to go confess judgment.   They didn't have a

10   guarantee from Sherman/Grayson Hospital, LLC.   They didn't

11   have a direct claim against Sherman/Grayson Hospital, LLC.

12   The settlement agreement provides -- provides LHP with those.

13   Q    That's right.

14        And they also didn't get the full amount of the claim

15   that they made in the complaint, as is -- as part of the

16   settlement agreement, correct?

17   A    And they also got a release from the counterclaims.

18   Q    Right.

19        So they took less, they got a release from all future

20   counterclaims, and they have a confessed judgment right with

21   respect to future action, which they agreed to handle in

22   accordance with a timing provision of the forbearance

23   agreement, correct?

24   A    I disagree with you on "handle" for the timing

25   provision.

1      But there was a tradeoff as part of the settlement

2   agreement that was negotiated as part of a mediation.

3   Q    All right.  And isn't the change in the procedures

4   really a change in the purchase agreement, in Section 9.5,

5   where it says "for indemnification claims."  So isn't what

6   that is intended to --

7   A    No.

8   Q    -- replace?

9   A    It supersedes -- it intends to reset the -- the

10   obligations.  It relates to the -- this supersedes all the

11   agreements.

12   Q    All right.  Let's move to the next issue, which is you

13   said Alecto Healthcare Sherman or Sherman/Grayson Hospital

14   could have made a payment from February 17th, 2022 to the

15   petition date, which is why you couldn't say whether they

16   didn't or not, correct?

17   A    I'm not sure of the second phrase.

18      But they could have made a payment, yes.

19   Q    Okay.  The question is:  Did they?

20   A    I don't believe so, no.

21   Q    All right.  And did you know that on the petition date -

22   -

23   A    That they had --

24   Q    -- that they did not make a payment?

25   A    I generally knew they had not made a payment, but I

1    didn't know if LHP had made a payment, either.

2    Q    Okay.  I'm just talking about Alecto Sherman and

3    Sherman/Grayson Hospital.

4         You knew that neither one of them had made a payment as

5    of the petition date, correct?

6    A    I don't know if I thought that specific question, did

7    they make a payment.  I don't believe they made a payment and

8    I don't think I would have thought differently, that they had

9    made a payment.

10   Q    Okay.  Are you familiar with the periodic report of

11   value tat we have prepared in this case for the subsidiaries

12   of the debtor and filed in this case?

13   A    The -- it's one of the schedules or there's a document.

14   I -- I don't know the title of it, that's what confuses me.

15   But I know there was a form filed out with respect to the --

16   I think the different subsidiaries, I believe.  I just forget

17   the name on the form.

18              MR. SULLIVAN:  Your Honor, I would like to provide

19   the witness with a copy of the document that I'm going to

20   refer to, and I can provide the Court a copy, as well.

21              THE COURT:  Yes, please.  Thank you.

22        (Pause in proceedings)

23              MR. SULLIVAN:  Oh, I'm sorry.  I have another one.

24              THE COURT:  Pardon?

25              MR. SULLIVAN:  I have -- I said (indiscernible)

1          THE COURT:  Oh --

2          MR. SULLIVAN:  (Indiscernible)

3     BY MR. SULLIVAN:

4     Q    Okay.  So, Mr. Sarrao, the document we're looking at is

5     document number -- Docket Number 79 from the debtor's case,

6     which was filed on July 18th of 2023.  And you signed it on

7     Page 2 of the document, correct?

8     A    That's correct.

9     Q    Okay.  And so included here are information relating to

10    subsidiaries, correct?

11    A    Yes.

12    Q    All right.  And so let's look at Page 11 of 117.

13    A    Okay.

14    Q    And that's part of Tab 2.  And this is financial

15    statements for Alecto Healthcare Services Sherman, LLC.  Do

16    you see that?

17    A    I do.

18    Q    Okay.  And then -- so let's go to Page 16.

19    A    You're looking at the top, Mr. Sullivan?

20    Q    Yes.

21    A    Okay.

22    Q    So you've got Alecto Healthcare Services Sherman, LLC's

23    year-to-date income statement, dated December 31st, 2022.  Do

24    you see that?

25    A    I do.

1    Q   Okay.  And if we look at Sherman gray -- there's a

2    column for Sherman/Grayson Hospital, Sherman M.D., and

3    Anesthesia, correct?

4    A   Correct.

5    Q   And I want to take you down to operating expenses using

6    -- on the left.  Do you see that?

7    A   I do.

8    Q   All right.  And then drop down to rents and leases.  Do

9    you see that?

10    A   I do.

11    Q   So the total paid for the year for rents and leases was

12    $200,000 and 19 -- $200,019, correct?

13    A   That's correct.

14    Q   Okay.  And that's less than the monthly obligation that

15    LHP paid to Altera based on the documents in this Court,

16    correct?

17    A   It's less than the monthly invoice, yes.

18    Q   Okay.  And this is -- we're looking at an income

19    statement for the year of 2022, correct?

20    A   That's correct.

21    Q   And the debtor had other -- or Sherman/Grayson Hospital

22    had other obligations for rent, other than to Altera,

23    correct?  It (indiscernible) have obligations to the secured

24    creditor in this case.

25    A   Yeah.  But that rent is listed below under nonoperating

69

1    expenses.  You're talking to M-P -- about MPT.

2    Q    Right.

3    A    That's not included.  There's a separate line item for

4    MPT.

5    Q    All right.  So does reviewing this year-to-date income

6    statement from December 31st of 2022 confirm your belief

7    that, neither Sherman/Grayson Hospital, nor Alecto Sherman

8    made a payment to Altera of the rent for the leases in the

9    medical office building?

10   A    Well, it confirms that roughly $200,000 was paid in

11   rents and leases and nothing --

12   Q    And --

13   A    -- nothing -- nothing more than that.

14   Q    Okay.  But you don't even know that that $200,000 was

15   paid to Altera or to another entity, correct?

16   A    I don't know.

17   Q    Right.  Okay.

18        And then, for the statement dated March 31st of 2023,

19   which is the next page, again, if you drop -- this is a year-

20   to-date income statement for the first quarter of 2023.  The

21   rents and leases, the total paid is 69,000 among the three

22   entities, correct?

23   A    That's correct.

24   Q    And that would be less than a monthly payment.

25   A    It would be less than the monthly invoice, correct.

1    Q    Okay.  Does that refresh your recollection that, neither

2    Sherman/Grayson Hospital, nor Alecto Sherman made payments to

3    Altera of any of these lease obligations?

4    A    Yeah, but I -- I don't know what's included in that

5    number.  But it -- it suggests to me that my belief is

6    correct that I did not believe that payments were made to

7    Altera Highland.

8    Q    Okay.  And these documents were available to you on the

9    petition date, correct?

10   A    I'm not sure if the March 31, 2023 were available on the

11   petition date because they were having issues with the IT

12   system and -- when they were produced.  But 2022 would have

13   been.

14   Q    Okay.  With respect to the June 28th demand letter from

15   LHP to Alecto Sherman, do you know when it was received?

16   A    I believe it was July 5th or July 6th.  It -- I think

17   they sent it by certified mail, and sometimes there's a delay

18   when certified mail comes.

19   Q    And was it forward to you?

20   A    It was.

21   Q    Okay.  And when you received it, did you have an

22   understanding that, based on the demand letter, LHP had paid

23   the amount of -- set forth in the letter prior to the

24   debtor's filing for bankruptcy?

25   A    Well, when I received the demand letter, that was

1   certainly their assertion, that they had -- they had paid

2   that.  I didn't see any backup or any of the backup that we

3   have -- the backup that the exhibits are.

4   Q    Okay.  And now that you've seen the backup, do you

5   understand that LHP has paid that amount prior to the

6   petition date?

7   A    Well, we say L-H -- the one question I said -- I think I

8   said early on is -- because it's redacted, which I understand

9   why -- I don't know if it's LHP that paid it, Ardent that

10  paid it, or a different entity that paid it.  But I certainly

11  know that group of companies appear to have paid it, based on

12  the wire forms.

13  Q    And LHP has stated in its proof of claim submitted under

14  penalty that it is owed that amount, correct?

15  A    I'd have to look at their proof of claim, but I'm not --

16  they say they're owed 3.7 million and change in their proof

17  of claim, yes.

18          MR. SULLIVAN:  Nothing further, Your Honor.

19          THE COURT:  Just for purposes of the record, let's

20  marked 4426 or Docket Number 79 as Exhibit 68.

21          MR. SULLIVAN:  Yes.  Thank you, Your Honor.

22      (Statements at Docket Number 79 marked Exhibit 68 for

23  identification)

24                      RECROSS-EXAMINATION

25  BY MR. WAXMAN:

1  Q    I only have a couple of questions for you, Mr. Sarrao.

2       First, can you open -- can you flip to Exhibit 13.

3  A    Okay.

4  Q    Is that the letter that Mr. Sullivan and I were both

5  referencing earlier, the demand?

6  A    Yes.

7  Q    And what's the date of that?

8  A    June 28, 2023.

9       (Participants confer)

10 Q    Can you go down to the third paragraph --

11 A    Okay.

12 Q    -- of that letter, starting off with "LHP"?

13      Can you read that, please?

14 A    Yes.

15          "LHP is not, by this letter, making demand under

16          the agreement or otherwise on Alecto Healthcare

17          Services, LLC, the Debtor in Case Number 23-10787,

18          or Sherman/Grayson Hospital, LLC, the Debtor in

19          Case Number 23-10810" --

20 Q    Okay.  That's good.  Thank you.

21      Putting aside the legal issue of whether or not the

22 proof of claim counts as a demand for purposes of the

23 settlement agreement, has any demand ever been made of

24 Alecto?

25 A    Not since the settlement agreement, no.

1    Q    I also want to go back to the issue of the CAM charges

2    and the reconciliation.

3         Can you open the binder to Exhibit 54?

4         (Pause in proceedings)

5    A    Okay.

6    Q    And go to the third page (indiscernible) third page.

7    And it is dated July 7th, 2022?

8    A    Yes.

9    Q    Have you had a chance to review this invoice?  I know

10   you only received these on Saturday.

11   A    I looked at all of the invoices, yes.

12   Q    Okay.  This is the -- is this the CAM reconciliation for

13   the prior year?

14   A    For 2021, yes.

15   Q    Okay.  And what's the date that this reconciliation

16   apparently occurred?

17   A    July 7, 2022.

18   Q    Okay.  So what was the debtor's petition date?

19   A    June 28 -- or June 16th, 2023.

20   Q    So, if this is an annual reconciliation, is it fair to

21   say that the next reconciliation would have been in July of

22   2023 --

23   A    Yeah, late --

24   Q    -- after the petition date?

25   A    Late June or early July of 2023, for -- for 2022.

1    Q    And the amount here is 965,000.  Do you have any reason

2    -- approximately.  Excuse me.  (Indiscernible) share is

3    approximately 966,000.

4         Do you have any reason to believe that the amount

5    between 2022 and 2023 is significantly different?

6    A    It -- again, there -- there was one tenant that came

7    into the space.  And if there paying a portion of the CAM

8    charge, it could -- it could reduce that, I don't think

9    significantly.

10        The other part is that the property taxes got reassessed

11   to go lower because that's part of the CAM charges.

12   Q    There could be more than one new tenant, correct?

13   A    There could be, yes.

14   Q    You haven't been to the facility in the last six months.

15   A    No, I have not.

16        MR. SULLIVAN:  I have no further questions, Your

17   Honor, of Mr. Sarrao.

18        THE COURT:  Mr. Sullivan, do you have any final

19   questions?

20        MR. SULLIVAN:  No, Your Honor.

21        THE COURT:  Okay.  Mr. Sarrao, you are excused.

22        THE WITNESS:  Thank you.

23      (Witness excused)

24      (Participants confer)

25        MR. SULLIVAN:  Your Honor, I don't have any more

1    evidence with respect to the motion or objection.

2            THE COURT:  Okay.  Anything on behalf of the

3    debtors?

4            MR. WAXMAN:  No, Your Honor.  Although it might be

5    a good idea for us to take a break, so that we can go through

6    the exhibits before going to oral argument.

7            THE COURT:  Yeah.  Why don't we take a break to

8    1:30.  That will give you time to do lunch and go through

9    exhibits.

10           MR. SULLIVAN:  Thank you.

11           THE COURT:  Okay.  So we're going to stand in

12   recess until 1:30.  Thank you.

13           UNIDENTIFIED:  Thank you.

14       (Luncheon recess taken at 11:53 a.m.)

15                     AFTERNOON SESSION

16       (Proceedings resume at 1:36 p.m.)

17           THE COURT:  Be seated.

18           We're back on the record on Alecto Healthcare.

19       **(No Recording Microphones at Counsel Table and Lectern)**

20           MR. WAXMAN:  Good afternoon, Your Honor.  Jeff

21   Waxman of Morris James.

22           I believe that we have conferred.  There's a bit of

23   a difference with respect to two, I guess summary documents.

24   I don't think the debtor has -- and this is 1 and 67.  I

25   don't think the debtor has any opposition to Your Honor

1    reviewing those documents.  These are summaries of

2    information that are contained in the other documents both

3    created by Mr. Sullivan.

4                    THE COURT:  Uh-huh.

5                    MR. WAXMAN:  We are not saying that anything is

6    necessarily wrong with them, but the better evidence is

7    simply the documents that the information is contained in.

8    But we certainly don't want to stop Your Honor from using

9    something, to the extent that Your Honor thinks is easier for

10   Your Honor to use, consider, et cetera, just that the primary

11   evidence for both of those is the underlying documents.  And

12   certainly, if Mr. Sullivan disagrees, he is welcome to say

13   so.

14                   The only other thing I would point out is there are

15   certain documents that are in here, specifically proofs of

16   claim, and the debtor has not object to proofs of claim.

17   There are claims that are going to be objectionable,

18   particularly Number 18, which the debtor completely disagrees

19   with.  But Your Honor can certainly consider them.  They were

20   not scheduled.  The debtor does not believe that it was

21   liable for that on the date.

22                   But it's 245,000, I believe.  That's not going to

23   make a difference, insofar as the threshold is 7.5 million,

24   and it's 7.8 without it and 8 point something with it.  So

25   this is really going to fall, as Your Honor noted at the

1   beginning, on the LHP claim that Your Honor has heard a

2   couple of words about earlier.

3                THE COURT:  Okay.

4                MR. WAXMAN:  Mr. Sullivan disagrees (indiscernible)

5                MR. SULLIVAN:  Your Honor, with respect to the

6   summaries, we did page through the evidence book in your

7   absence, we believe they're covered by Rule 1006, summaries

8   to prove content.  And (indiscernible)

9                THE COURT:  I'm sorry.  What rule?  I'm sorry.

10                MR. SULLIVAN:  Rule of Evidence 1006.

11       (Pause in proceedings)

12                MR. SULLIVAN:  So the rule does require that the

13   documents that are summarized are made available, and it says

14   the Court may order the proponent to produce them in court.

15   Here, all of the documents that are summarized are in the

16   binder --

17                THE COURT:  Right.

18                MR. SULLIVAN:  -- and being produced.  So we think

19   that the summaries are admissible.  And I just -- I mention

20   that because I don't think there should be any restriction on

21   the Court's reliance on them.

22                MR. WAXMAN:  Your Honor, I think Rule 1006 speaks

23   for itself.  The proponent may use a summary chart or

24   calculation to prove the content of voluminous writings that

25   cannot be conveniently examined in court.  These documents

1    can be conveniently examined in court.  They aren't that

2    voluminous.  They fit into two binders and Your Honor has

3    copies of all of them.

4           But again, Your Honor, this is -- we're not arguing

5    about this.  If Your Honor finds it more convenient to look

6    at two spreadsheets, we're certainly not going to make Your

7    Honor's life more difficult.

8           THE COURT:  Well, I can assure you that I'm going

9    to look at the underlying documents --

10          MR. WAXMAN:  I --

11          THE COURT:  -- so --

12          MR. WAXMAN:  I have -- Your Honor, I have no doubt

13   about that.  And we -- again, we're not objecting to that.

14   We just want to raise the point that, if there's the two

15   available, the best evidence is.

16          THE COURT:  Are you objecting to the content?  I

17   guess I'm trying to -- I am trying to determine what your

18   objection is, Mr. Waxman, because --

19          MR. WAXMAN:  You know, I will confess I'm standing

20   here and trying to figure it out.  I just don't know what

21   I've gone back through and checked to make sure that

22   everything adds up correctly.

23          THE COURT:  Well --

24          MR. WAXMAN:  I mean, I presume that it does.

25          THE COURT:  Well, why don't I do this?  Are you

1    agreeing to the admission of all other documents?

2              MR. WAXMAN:  Yes.

3              THE COURT:  So why don't I just admit everything

4    else and rely on Exhibit Number 1 and 67 as a demonstrative

5    presented to the Court.

6              MR. WAXMAN:  That's fine, Your Honor.

7              MR. SULLIVAN:  As long as you can rely on them,

8    Your Honor, so that you can look at them (indiscernible)

9    that's fine with me.

10             MR. WAXMAN:  We have no objection --

11             THE COURT:  No objection --

12             MR. WAXMAN:  -- to your looking at them.

13             THE COURT:  All right.

14             MR. WAXMAN:  I will --

15             THE COURT:  I've deemed this resolved.

16             MR. WAXMAN:  I --

17             MR. SULLIVAN:  Okay.

18             MR. WAXMAN:  Your Honor, we're not trying to be

19   overly pugilistic or difficult, particularly if there's

20   something that makes Your Honor's life easier, then that's

21   fine.

22        (Exhibits 2 through 66 received in evidence)

23        (Exhibit 68 received in evidence)

24             MR. WAXMAN:  I think, with that, Your Honor --

25             THE COURT:  Okay.

1      MR. WAXMAN:  -- unless there's anything further, I

2  think we can proceed to closing.  And again, this is the Reed

3  Creditors' motion, so I think it's appropriate for them to

4  get in the batter's box first.

5      THE COURT:  Okay.  Can you bear with me just a

6  second, Mr. Sullivan?  Are you going to refer to exhibits?

7      MR. SULLIVAN:  A few.

8      THE COURT:  You may.  I just want to --

9      MR. SULLIVAN:  A few, Your Honor.

10     THE COURT:  Okay.  Let me just get --

11     MR. SULLIVAN:  I'm not -- certainly not 67.

12     (Laughter)

13     THE COURT:  Let me just get to a point where I can

14  easily access them.  Okay.

15     MR. SULLIVAN:  Thank you, Your Honor.  For the

16  record, Bill Sullivan of Sullivan Hazeltine Allinson on

17  behalf of the Reed Creditors.

18     Your Honor, we spent a fair amount of time this

19  morning on the underlying documents, and that's important

20  because the underlying documents establish what needs to be

21  established here, and that the claim of LHP is liquidated and

22  non-contingent.

23     But in summary of the critical provisions, under

24  the purchase agreement, Section 9.3(e), Alecto Sherman is

25  liable to LHP for any damages sustained by LHP with respect

1   to LHP's guarantee of the Sherman/Grayson Hospital leases,

2   the five leases assigned to Sherman/Grayson Hospital.  So

3   that's point number one.

4           The debtor is unconditionally and absolutely liable

5   to LHP for the same damages under its guarantee, and that's

6   at Paragraph 1 of the guarantee, dated September 23rd, 2024

7   [sic], where it says:

8               "The guarantor hereby absolutely, unconditionally,

9               and irrevocably guarantees to the guarantee parties

10              the due and punctual payment, performance, and

11              discharge of each and every of purchaser's

12              obligations under the purchase agreement."

13          And to be clear, the purchaser is Alecto Sherman,

14   not a debtor.

15          The guarantee is a separate contract.  The case law

16   is -- makes that clear.  It's a separate obligation.  And we

17   referred in our reply, Your Honor, to Delaware law on

18   guarantees.  Delaware law applies here.  And there is two

19   cases we referred to, the Fanatics Retail case, which is a

20   2020 case from the District Court, and then the Ajax Rubber

21   case from a hundred years ago, in 2023 [sic], still good law.

22          But the Fanatics case makes it clear, in order to

23   prove and allow the LHP proof of claim, LHP would need three

24   things:

25              An absolute and unconditional guarantee.  They've

1    got that.

2              THE COURT:  But how -- let me -- can I stop you?

3    And I really hate to stop you in a three-prong argument --

4              MR. SULLIVAN:  I'm fine.

5              THE COURT:  -- but I'm going to do anyway.

6              MR. SULLIVAN:  I'm fine.

7              THE COURT:  How do I get past testimony that says

8    the guarantee and the purchase agreement were superseded by

9    the settlement agreement?

10             MR. SULLIVAN:  Well, that testimony is directly at

11   odds with the testimony of Mr. Sarrao at the 341 meeting.

12   It's also -- what Mr. Sarrao testified to is also

13   inconsistent with what LHP believes.

14             So let me refer you first to the LHP claim.  So

15   that's Exhibit 5.  And there is a summary of claim, and this

16   was submitted on August 14th, two years after the settlement

17   agreement.  And the summary of claim is really on -- it's

18   really three sentences.  And the first one introduces the

19   purchase agreement.  And the second sentence says:

20             "Under the terms of the purchase agreement, Alecto

21             Sherman agreed to indemnify and hold harmless LHP

22             Hospital Group, Inc. for any damages that it

23             suffered in connection with a variety of

24             circumstances described in the purchase agreement,

25             including certain obligations associated with the

1           medical office building."

2                And then the next sentence says:

3                "Alecto Healthcare Services, LLC, the debtor,

4                executed a guarantee in favor of LHP pursuant to

5                which it guaranteed Alecto Sherman's obligations

6                under the purchase agreement, including the

7                indemnification provisions of it."

8                LHP, in its current proof of claim, does not

9      reference the settlement agreement as the basis on which it's

10     asserting the claim.

11               We go to the 341 hearing transcript.  That's at

12     Exhibit 9, Your Honor.  The continued 341 meeting was held on

13     October 17th, 2023.  At Page 16 of that transcript, I asked

14     Mr. Sarrao about the LHP proof of claim.  And in Line 4, I

15     said:

16               "Okay.  So they have a three-sentence summary of

17     their claim.  I'm going to read one of the sentences."

18               And then I read the two sentences.

19               And at Line 16, I said:

20               "So are those statements accurate?"

21               And the answer was:

22               "Yes, there was the purchase agreement."

23               And he described the purchase agreement and the

24     space it was for.

25               And then, on the beginning of 17, he said:

1          "So those two statements are correct."

2          Mr. Sarrao didn't say, no, those two things are no

3     longer relevant, it's the settlement agreement that controls.

4     That was six weeks ago, Your Honor.  So Mr. Sarrao had

5     directly changed his testimony today from what he testified

6     to before we filed the motion.

7          Now I also want to refer to the context of the

8     settlement agreement.  So this is in the -- on the first

9     page.

10          THE COURT:  The recitals?

11          MR. SULLIVAN:  The whereas clauses, right.  So I'm

12     going to go -- one, two, three, four, five, six, seven -- the

13     eighth whereas clause says:

14          "Whereas, LHP expects to continue to accrue out-of-

15          pocket expenses payable to Altera for which Alecto

16          Healthcare Services Sherman, LLC has an obligation

17          to indemnify LHP under the operative agreements,

18          and the debtor has guaranteed those indemnification

19          obligations" --

20          And it calls those obligations the "future

21     expenses."

22          It doesn't say anywhere that they've decided to

23     replace --

24          THE COURT:  Well --

25          MR. SULLIVAN:  -- those --

1          THE COURT:  Well, in fact, doesn't it say, at the

2    final recital paragraph:

3          "The foregoing recitals are true and correct and

4          are hereby incorporated into this agreement by

5          reference."

6          MR. SULLIVAN:  Yes, it does, Your Honor.

7          THE COURT:  So what does that mean?

8          MR. SULLIVAN:  That means that the continued future

9    expenses arise out of the operative agreements.  That's what

10   that means.

11         And Section 6 through 9 talk about procedures to

12   deal with the future expenses.  Now this is after there has

13   been a lawsuit filed.  It's also -- putting it in context,

14   it's eight years after the original documents have been

15   filed.  It's also after Sherman/Grayson Hospital has turned

16   over the premises and is no longer in possession.  So there's

17   very little to dispute here.

18         And so what is clear from Paragraph 6, it says --

19   sixth line down:

20         "Accordingly, the Alecto Defendants agree to the

21         following procedure for payment of future

22         expenses."

23         So it is a procedure for payment of future

24   expenses.  It's a procedural change from Section 9.5 of the

25   purchase agreement, which is where there was a procedure for

1    indemnification before, at the time of the transaction that

2    included things that would be beyond just the lease issues.

3    (a), (b), (c), and (d) are things that probably were cleared

4    up within the first year after the purchase agreement was

5    entered.

6          But the point being is that there's a procedure

7    here to be applied going forward.  And the only reasonable

8    interpretation of that is that LHP gave up the right to

9    demand on a monthly basis.  The agreed to a forbearance where

10   they would -- after one year, they can make a demand; and

11   then, every six months, they can make a demand for payment.

12   So that avoided the uncertainty of getting repeated demands

13   every month throughout the year.

14         In exchange for that, LHP got a right to confess

15   judgment because the parties were no longer going to dispute

16   that the rent obligations were due.  And the only requirement

17   for it was to give a fifteen-day notice that this is the

18   amount due and, if you don't pay it in 15 days, we're going

19   to exercise our right to a confessed judgment.

20         To be clear, Paragraph 60 waives any defenses,

21   other than a miscalculation of the amount due.  It waives any

22   defense about failure to mitigate against LHP.  And that's a

23   recognition by the parties that LHP, who was also stuck with

24   this (indiscernible) is not going to pay more than it has to.

25   But if it does pay, the debtor is going to pay LHP back.

1          Now the bankruptcy process obviously creates

2   changes in what the parties and, you know, I guess agreed to

3   as procedures under an agreement.  And the bankruptcy process

4   supersedes Paragraphs 6 through 9.  Because of the automatic

5   stay, LHP can't issue a demand notice.  Because of the

6   automatic stay, LHP can't confess judgment.  The Bankruptcy

7   Code says, instead of whatever remedies you have, you have a

8   right to file a proof of claim, and if that claim is allowed,

9   you have a right to get paid under the plan.  So these

10  procedures really don't apply anymore.  It's the Bankruptcy

11  Code procedures that apply.  And all of this is a red

12  herring.

13          But if you take it to its extreme, L-H -- the

14  debtor's position is that LHP can't even prevail on its proof

15  of claim because they can't make a demand.  That's a

16  nonsensical position.

17          The evidence is clear, unequivocal, that LHP has

18  been damaged in the amount of $3.7 million, that it has paid

19  that amount on its guarantee, and the documents make the

20  debtor's obligation to pay that unequivocal and absolute.

21  And accordingly, it's appropriately included in the

22  calculation of the debtor's eligibility to be a Subchapter V

23  debtor.

24          I would step back for a second, Your Honor, because

25  I did take things out of order --

1          THE COURT:  Yeah.

2          MR. SULLIVAN:  -- based on the questions that you

3     asked.

4          THE COURT:  Please do because I think you were

5     going to talk to me about --

6          MR. SULLIVAN:  We don't --

7          THE COURT:  Delaware law and Ajax and -- yes.

8          MR. SULLIVAN:  The two questions before Your Honor

9     are really:  Are they -- is the LHP claim liquidated and is

10    it non-contingent?  Okay?

11         And so, with respect to whether it's liquidated, I

12    think we referred and the best reference in the reply was to

13    the Hall case, which is a 2023 case from the Bankruptcy

14    Middle District of Florida, 650 B.R. 595.  A debt is

15    liquidated if the amount owed is readily and precisely

16    determinable by reference to an agreement.  Debts under a

17    contract are generally considered liquidated even if they are

18    disputed.  That's at Page 599.  There's a number of cites

19    that go to that same proposition.  I don't think -- and they

20    make a contrast with personal injury claims, which are

21    clearly not (indiscernible)

22         So I don't think there's any dispute here that this

23    claim is liquidated, based on the documentation that we went

24    through and the calculations that were made and --

25         THE COURT:  Well, let me ask you about that.  Is

1    CAM liquidated?

2                MR. SULLIVAN:  Yes.

3                THE COURT:  And why?

4                MR. SULLIVAN:  So --

5                THE COURT:  Didn't I hear testimony that CAM is not

6    reconciled until approximately six, seven months after the

7    conclusion of the year?

8                MR. SULLIVAN:  Okay.

9                THE COURT:  It's June or July the next year for the

10    previous year.

11                MR. SULLIVAN:  Right.  So the lease provides -- and

12    the leases are in the record, 17 to 21; there's five leases.

13                THE COURT:  Uh-huh.

14                MR. SULLIVAN:  And all of them have a section for

15    CAM, which is Section 3.2, operating expenses.

16                And Your Honor has seen that they're billed as part

17    of the monthly amount and they're billed in an estimated

18    amount, which is covered by 3.21, which says:

19                "Tenant's pro rata share of operating expenses

20                shall be estimated by the landlord."

21                Right?

22                THE COURT:  So -- oh, go ahead.  I'm sorry.

23                MR. SULLIVAN:  Okay?  And then Section 3.23 says,

24    at the end of the calendar year, there's a reconciliation.

25    And if there's a balance due, the tenant has to pay it, and

1    if there's a balance owed, if they collected too much, the

2    landlord has the option of returning it or applying to the

3    next payment.

4            And Your Honor bear with me.

5            THE COURT:  No, certainly.

6        (Participants confer)

7            MR. SULLIVAN:  So there's a record about what

8    happened in 2022, Your Honor, and that's at Tab 64.

9        (Participants confer)

10           THE COURT:  61?

11           MR. SULLIVAN:  61.

12       (Participants confer)

13           MR. WAXMAN:  62.

14           MR. SULLIVAN:  Okay.

15           THE COURT:  You're looking at --

16           MR. SULLIVAN:  Okay.

17           THE COURT:  It's the attachment to 62?

18           MR. SULLIVAN:  I'm looking at -- yes, I'm sorry.

19   Exhibit 62.  So Exhibit 62, the fifth page is a letter dated

20   June 28th, 2023.  And it's the CAM reconciliation for the

21   2022 annual operating expenses.  And it says that the total

22   due to be returned is $32,985.80, and it says:

23           "A credit has been issued to your account and may

24           be taken with your next remittance."

25           So that credit goes to LHP for the next rent, which

1    may explain why there may be a difference in amount that LHP

2    pays.  But none of that benefits the debtor once LHP has paid

3    it, so --

4           THE COURT:  But it's your position that an estimate

5    that you paid throughout the year is a liquidated amount.

6           MR. SULLIVAN:  Yes.  It's called for in the lease,

7    it's specified in amount.  The fact that it's subject to

8    reconciliation doesn't mean that it's not liquidated.

9           And again, to the extent that there was a

10   reconciliation due in July or after the petition date, to the

11   extent that LHP overpaid, LHP would get a credit for its next

12   -- as part of its next amount due.

13          Your Honor, the -- one of the things that the Hall

14   case also says is that disputed debts are not excluded.  So,

15   if they dispute the amount, that doesn't mean it's excluded

16   from the calculation based on the amount due on the petition

17   date.  That's at Page 599 of the Hall case.

18          And on the contingency issue, the Hall case also

19   involved a guarantee.  And the issue there was whether the

20   individual debtor had executed a guarantee in her individual

21   capacity, in addition to a guarantee for the entity.  And

22   once the Court found that she had entered it in her

23   individual capacity, the Court found that the obligation was

24   non-contingent immediately because it was an unconditional

25   guarantee.

1          THE COURT:  Does it make a difference whether or

2    not there is a guarantee in this case?

3          MR. SULLIVAN:  I mean, if there is -- does it make

4    a difference?  If --

5          THE COURT:  So let's say there's no guarantee in

6    this case.  Let's say that the settlement agreement

7    superseded everything.  Based on the settlement agreement,

8    does the debtor still exceed the eligibility ceiling?

9          MR. SULLIVAN:  Yes.

10         THE COURT:  And why?

11         MR. SULLIVAN:  Well, it -- I guess the reason why

12   I'm hesitant on the premise is because, without the

13   guarantee, I don't know how you calculate the future

14   expenses, right?

15         Section 6 talks about a procedure for paying future

16   expenses.  But the settlement agreement itself doesn't

17   specify, other than say they're covered by the operative

18   agreements.

19         Now the point is, is that, if the settlement

20   agreement says that LHP can make a demand and they have to

21   pay, and the only thing they can do is say, well, maybe you

22   miscalculated, we've got evidence that LHP paid.  So there's

23   no dispute as to what they paid.

24         And as I indicated before, the demand and the

25   confession of judgment process go away in Bankruptcy Court.

1    It's a proof of claim process, that's a demand for payment in

2    bankruptcy that is, you know, the widely established and

3    recognized form of making a claim.  And it's -- and this --

4    it's appropriately considered by this Court in this context,

5    based on the cases that we've cited.

6           I also think, Your Honor, with respect to the

7    entire agreement clause, that the interpretation that somehow

8    all of these documents disappear is really a -- is really a

9    big a reach as I can see.  The entire agreement clause is a

10   customary clause in every contract that is made to prevent

11   discussions relating to the making of that contract or prior

12   drafts from being referenced once the document gets signed.

13   That's the general intent of that clause.

14          If the -- this confidential settlement agreement

15   was going to get rid of the guarantees and the obligations of

16   the purchase agreement, it would, at minimum, say it in

17   whereas clauses, but also should say it in the release

18   clauses where it says we're going to release the guarantee

19   and whatever and so nobody is confused about it.  The fact

20   that LHP believes it's still operable is strong evidence that

21   that's not an appropriate interpretation of the settlement

22   agreement under standard contract interpretation rules, it is

23   -- again, you know, the purchase agreement has more parties

24   than this.  The guarantee is really just signed by the

25   debtor.  Now two entities sign it as represent -- as the

1    parties that are being guaranteed and they're representative

2    of other parties.  But a guarantee is an instrument.  It's

3    really a one-party, one-way obligation.

4            So, Your Honor, for all of those reasons, the

5    argument that the guarantee and the purchase agreement no

6    longer apply does not hold water.

7            Your Honor, I did want to mention -- I think I did

8    talk about the Delaware law cases briefly.  But the Fanatics

9    Retail case said you need three things:

10           You need an absolute and unconditional guarantee,

11   which we have.

12           You need an underlying debt.  The payments by LHP

13   evidence that.

14           And you need the guarantee's failure to perform.

15   The debtor has acknowledged it hasn't made any payments, and

16   neither have its subsidiaries.

17           Based on those, the LHP claim is allowable in the

18   amount asserted right now.  But that isn't the standard, Your

19   Honor.  The standard is whether it's liquidated and non-

20   contingent.  Both of those are easily met under the

21   applicable cases.  And we ask Your Honor to grant the relief

22   requested in the motion.

23           THE COURT:  Before you sit down, based on your

24   clients' calculation, and assuming LHP has a claim of 3.7

25   million, as set forth on -- in the exhibits, what is the

1    dollar value in excess of the 7.5-million eligibility

2    ceiling?  What's the delta here, based on your calculation?

3              MR. SULLIVAN:  The delta between what?

4              THE COURT:  The delta between the --

5              MR. SULLIVAN:  Oh, the --

6              THE COURT:  -- 7.5-million --

7              MR. SULLIVAN:  The threshold?

8              THE COURT:  -- threshold and what the amount of

9    claims are.

10             MR. SULLIVAN:  We believe it's --

11             THE COURT:  Four mil -- I mean 400,000?

12             MR. SULLIVAN:  We believe it's $600,000 over

13   because of the claim filed by the ESPA, but --

14             THE COURT:  Okay.  All right.

15             MR. SULLIVAN:  That's the only difference.

16             THE COURT:  All right.

17             MR. SULLIVAN:  Right?  It's between four hundred

18   and $600,000.

19             But Your Honor, the -- I'm not sure that that

20   really matters, right?  I mean, the -- I think the Hall case

21   dealt with that, as well.

22             THE COURT:  Because your position is that the

23   entire claim is liquidated.

24             MR. SULLIVAN:  Of LHP?  Yes.  And once you're over

25   the threshold, you're over the threshold.

1          THE COURT:  Right.  It is a firm ceiling.

2          MR. SULLIVAN:  Yes.

3          THE COURT:  Let me ask you this.  I'm sorry.

4          MR. SULLIVAN:  Oh, I'm happy to --

5          THE COURT:  I may call you back up.

6          MR. SULLIVAN:  That --

7          THE COURT:  But --

8          MR. SULLIVAN:  You can.

9          THE COURT:  -- excluding CAM for 2023, does the

10    debtor exceed the 7.5-million-dollar threshold?

11          MR. SULLIVAN:  Your Honor, I didn't do that

12    calculation.

13          THE COURT:  Okay.  It's okay.  I ...

14        (Participants confer)

15          MR. SULLIVAN:  Your Honor, we believe -- well, if

16    you recall, the 2022 reconciliation involved a net of $32,000

17    that would be returned.  So, if it's in the same ballpark

18    this year, that -- it still doesn't get close to the

19    $400,000.

20          But the payment of CAM as part of the rent is a

21    requirement of the lease; it's not an optional issue.  So the

22    nature of the reconciliation process is unlikely to create

23    any sort of significant -- and I -- also, with respect to the

24    way that the landlord has handled it, the landlord says any

25    refund you get a credit against the next month.  It doesn't

1      benefit, it doesn't get paid back to LHP and reduce their

2      claim.

3              THE COURT:  Thank you, Mr. Sullivan.

4          (Pause in proceedings)

5              MR. WAXMAN:  Whenever you're ready, Your Honor.

6              THE COURT:  Give me one second.  Okay.

7              You may begin, Mr. Waxman.

8              MR. WAXMAN:  I'm sorry.  I couldn't hear you.

9              THE COURT:  I said you may begin --

10             MR. WAXMAN:  Oh --

11             THE COURT:  -- at your convenience.

12             MR. WAXMAN:  -- that's okay.  Thank you, Your

13     Honor.  May it please the Court, Jeff Waxman of Morris James

14     on behalf of the debtor.

15             Your Honor, there's a lot of ground that has been

16     covered, and I'm not going to go through the Alpha to the

17     Omega with respect to the facts.  I think Your Honor has a

18     very clear understanding of the facts (indiscernible)

19             I do want to flag a couple issues that Your Honor

20     has already addressed, in part.  And I want to be responsive

21     to what I think Your Honor's concerns are.  And I think Your

22     Honor has -- and I don't mean this to (indiscernible) with

23     the Court, but I think Your Honor has --

24             THE COURT:  Don't worry.

25             MR. WAXMAN:  -- (indiscernible)

1          THE COURT:  It doesn't work with me, anyway.

2          MR. WAXMAN:  And I already knew that Your Honor.

3    But I think Your Honor has actually put your finger on the

4    underlying issue.

5          Let me start off with the -- with one of the

6    questions that you asked and Mr. Sullivan attempted to

7    answer, but frankly, could not because there is no right

8    answer to this beyond what the clear language is, and that

9    was the question of superseding.  And I refer, of course, to

10   Exhibit 12.  This is the settlement agreement.

11         First, Mr. Sullivan, representing the Reed

12   Creditors, spoke to the intent of LHP.  There's no evidence

13   of what their intent is.  If there's any evidence, it's Mr.

14   Sarrao's testimony since he was involved in negotiating it

15   and signing it.  And his testimony from earlier today was

16   this was intended to supersede.

17         But were that not enough, the language in the

18   actual agreement says:

19              "-- fully supersedes any and all prior agreements

20              or understandings, written or oral, between the

21              parties."

22         It couldn't be clearer.  That is clear an

23   unambiguous.  It's not a bit -- it's not having to do with a

24   guarantee, it's not having to do with leases.  It is all

25   agreements between the parties are now superseded and they're

1    set forth in this agreement.

2          So all the arguments that the Reed Creditors have

3    addressed today that are based upon the underlying guarantee,

4    all the cases that are cited in the Reed Creditors' two

5    pleadings that deal with the guarantee are not applicable.

6          THE COURT:  But Mr. Waxman, how do I reconcile that

7    with the language that the recitals are true and correct and

8    are hereby incorporated into this agreement by reference?

9          MR. WAXMAN:  I don't understand what the issue --

10    they are true and correct.

11          THE COURT:  And they're incorporated into this

12    agreement.  What does that mean?

13          MR. WAXMAN:  That means that that is what happened

14    in the past.  That is the basis of what has happened.  That

15    does not -- but the actual agreement going forward, this is

16    the whereas, what has happened, but not what is going to

17    happen, what are the parties' rights going forward.  That is

18    clearly delineated, not in the whereas clause, but after the

19    now, therefore clause --

20          THE COURT:  Yeah, but --

21          MR. WAXMAN:  -- which is what's determinative of

22    the parties' going forward rights.

23          THE COURT:  But then why would the whereas

24    recitals, the next-to-the-last one on Page 1, reference the

25    future expenses that are in Part 6 of the settlement

1    agreement as -- and the operating agreements -- operative

2    agreement?  Sorry.

3              MR. WAXMAN:  Well, they are -- the foregoing

4    recitals were true.  There were underlying agreements.  There

5    were all the things that were set forth in the recitals.  LHP

6    did seek damages.  On January 21st, LHP did file a petition.

7    They sought recovery.  They seek recovery.  They seek

8    recovery.  They expect to continue.  They may continue to

9    accrue.  All those are correct, there's no question about

10   that.

11             The question is:  What are the parties' rights

12   going forward, and that's what the underlying agreement --

13   everything after the now, therefore, that's the parties'

14   rights from the date of the signatures and the execution of

15   this agreement.  And this agreement says everything that

16   happened in the past is the past, this is the rights that you

17   have going forward.

18             And Mr. Sullivan is absolutely correct, there was

19   give and take.  That's the part of any -- that's every

20   settlement that I've ever been a part of.  Somebody gives and

21   the other person gives something else.

22             In this case, there is a clear, unambiguous process

23   for when things come due, if they come due.  Paragraph 8 --

24   excuse me.  Paragraph 6.  Excuse me.

25             "LHP shall make written demand upon the Alecto

1          Defendants for a specified amount in accordance

2          with the forbearance schedule set forth in

3          Paragraph 8."

4          There's something that has to be done by LHP.  They

5     have to send the notice.  After that, there are 15 days; 15

6     days passes, then Alecto has to remit payment.  Until they've

7     made that demand, there's no obligation, there's no

8     obligation to pay, so there is a contingency there.

9          But in addition to that, there are other

10    contingencies, as well, because these are all premised upon

11    and (indiscernible) I'm getting some feedback so excuse me,

12    if I can move this away.  I don't know if it's picking it up.

13         THE COURT:  That could have been me opening my

14    binder, I may have --

15         MR. WAXMAN:  Okay.

16         THE COURT:  -- hit something.  I'm sorry.

17         MR. WAXMAN:  That's okay.  Your Honor, I just want

18    to make sure that the record is clear.

19         The other issue is there was at least one

20    subletting of the amount.  The debtor has no control to even

21    require the subletting.  But if subletting occurs, the amount

22    goes down.  These are all contingencies to the liabilities.

23         And as much as the Reed Creditors rely upon cases

24    that address -- excuse me -- that address the guarantees, it

25    just simply doesn't matter because of the provision that the

1      settlement agreement is the operative document.

2            Again, Your Honor, the -- and now I'm not sure if

3      I'm getting picked up by the -- good?  Thank you.

4            This is a relatively simple matter.  I know that

5      you've heard a lot of argument and you've gotten a lot of

6      documents.  But this is a straightforward legal issue under

7      Section 1182(1), whether or not, as of the date of the filing

8      of the petition -- and that's important, the date of the

9      filing of the petition -- or an order of the date -- or of

10     the date of the order for relief in an amount not more than

11     7.5 million, excluding debts owed to one or more affiliates

12     or insiders.  So that's the issue, not as of the petition

13     date and aggregate non-contingent, liquidated, secured, and

14     unsecured debts.  So it can be either contingent or

15     unliquidated.  Excuse me.  Sorry.  It has to be non-

16     contingent and liquidated.

17           So the issue here is solely down to LHP.  I would

18     note, Your Honor, that the debtor has significant issues with

19     one of the claims that Your Honor just discussed, which is

20     the two-hundred-and-forty-five-thousand-dollar claim.  And we

21     are not at the point where the debtor has started objecting

22     to claims.  It is anticipated that there will be an objection

23     to that claim, although this is a Sub V case.  This will

24     likely be a pot plan, and so it would be a net detriment to

25     the estate.  If Your Honor would like, certainly Mr. Sarrao

1    can testify as to all of the various issues with respect to

2    that claim.  But I would just raise that, as well, because

3    Your Honor did raise that.

4          With respect to -- excuse me.  I want to get to the

5    issue of contingency.  And I really don't need to go back

6    over my papers.  I know from experience Your Honor has

7    already read them.  But the Bankruptcy Code doesn't define

8    "contingent."  Courts typically say, where a term is not

9    defined, you look at what the plain meaning is.  We cite what

10   "contingent" is from Black's Law Dictionary:  A claim that

11   has not yet accrued and is dependent upon some future event

12   that may never happen.

13         They haven't sent the notice.  They didn't send the

14   notice as of the petition date.  It was contingent.  The

15   obligation to remit payment was conditioned upon their

16   sending that notice.

17         THE COURT:  What was the debtor -- as of the

18   petition date, what was required when one elects --

19         MR. WAXMAN:  I'm sorry.

20         THE COURT:  -- sub --

21         MR. WAXMAN:  I can't hear Your Honor over the fan.

22         THE COURT:  Oh.  As of the petition date, what is

23   required of a debtor when making an election, in terms of the

24   eligibility limit, the 7.5 million?

25         MR. WAXMAN:  What is required?  It has to do some

1  due diligence with respect to what the total amount of the

2  claims are.

3        But Your Honor, if the debtor has no notice of what

4  the claims are because it hasn't received the notice, it's

5  inconceivable that a debtor could knowingly make a decision

6  about what the amount of the claim is when it hasn't gotten

7  that amount, particularly when it's contractually -- the

8  other party is contractually required to send a notice or

9  demand before that amount is due.

10       THE COURT:  So you -- it's your position that, even

11 if a debtor knows that there's an amount due under an

12 agreement, then, unless and until a demand is made, that

13 amount is not due --

14       MR. WAXMAN:  Well, not --

15       THE COURT:  -- for purposes of determining your

16 eligibility under Sub V.

17       MR. WAXMAN:  Not necessarily, Your Honor.  But that

18 is why there are -- there is contingent, disputed,

19 unliquidated, C, U, D boxes on the schedules.

20       The debtor clearly knew something was due because

21 it --

22       THE COURT:  But the debtor put down zero, right?

23       MR. WAXMAN:  It did because it didn't know what the

24 amount was.  It was still contingent and it was still

25 unliquidated as of the petition date.  In fact, it would have

1    been improper for the debtor to put down a number what --

2    that it didn't know was correct.

3          I don't know how you circle that square or square

4    that circle, depending on how you look at it, when there is

5    no information that has come from the other party that says

6    what the amount is.  We would be asking the person signing

7    under penalty of perjury to declare that an amount is

8    correct.  In this case, zero is much more correct than if

9    they had written 200,000, 500,000, 800,000, without knowing

10   what that amount is.

11         Your Honor, questions of contingency aren't

12   determined upon whether the creditor may extract full

13   repayment from the debtor immediately, but whether it had the

14   -- and this is a quote:

15              "-- right to payment or right to an equitable

16              remedy at the time the debtor filed its petition."

17         And Your Honor, that's the Cox case from the

18   Eastern District of Washington, 2016.

19              "A debt is deemed contingent if liability relies on

20              a future extrinsic evidence" --

21              Excuse me.

22              "-- event that may never occur."

23         And that's Parking Management.

24              THE COURT:  But here, given Mr. Sarrao's testimony

25   and given what the monthly rent was, are you telling the

1    debtor could not have determined an amount?

2              MR. WAXMAN:  Not necessarily, Your Honor.  Rent is

3    determined by two components.

4              THE COURT:  Rent and CAM.

5              MR. WAXMAN:  There's the base rent --

6              THE COURT:  Right.

7              MR. WAXMAN:  -- and there's the CAM.

8              THE COURT:  But you're saying base rent was

9    contingent.

10             MR. WAXMAN:  Base rent is not contingent, Your

11   Honor.  Well, base rent is certainly liquidated.  It's still

12   contingent because it's premised upon the requirement in

13   Paragraph 6.  There still needs to be a demand there, but

14   that's not contingent.  Excuse me.  That's -- excuse me.

15   That's not unliquidated.  The CAM is absolutely unliquidated.

16             And to answer your question that you asked Mr.

17   Sullivan at the end, we actually have done a preliminary

18   review.  And as Mr. Sarrao testified to, based on his rough

19   estimate, there's approximately 35 percent of the monthly

20   amounts that are for CAM.  So it's not an insignificant

21   portion, Your Honor.

22             THE COURT:  Well, I think he said 30 --

23             MR. WAXMAN:  Thirty?

24             THE COURT:  -- to 35.

25             MR. WAXMAN:  Okay.  So out of 3.7, that's over

1    $900,000.

2              THE COURT:  How much did you say?  I'm sorry.

3              MR. WAXMAN:  I said if the total claim is $3.7

4    million, Your Honor, 300 -- 30 percent is over 900,000

5    (indiscernible)

6              THE COURT:  But as of the petition date, 2022 CAM

7    was already determined, right?

8              MR. WAXMAN:  I --

9              THE COURT:  We're only talking about six months of

10   CAM.

11             MR. WAXMAN:  Actually, the last thing I saw I think

12   was for July, and maybe I'm mistaken.  But either way, it's

13   not an insignificant portion, particular if you take out the

14   two-hundred-and-forty-five-thousand-dollar claim that is

15   baseless.

16             THE COURT:  Yeah, but I don't have any evidence in

17   front of me about any other claims.

18             MR. WAXMAN:  Well, Your Honor, I don't think --

19             THE COURT:  I mean to say that it's baseless,

20   right?

21             MR. WAXMAN:  Well, Your Honor, if you require more

22   testimony from Mr. Sarrao, he is here and he can tell you all

23   the reasons why it's (indiscernible) but at the very least,

24   this is not an insignificant amount of CAM charges if Your

25   Honor decides that it can split the claim in two pieces.  But

1     that still doesn't get past the fact that it's contingent.

2              THE COURT:  And your argument is it's contingent

3     because a demand was never made.

4              MR. WAXMAN:  Correct, Your Honor.  And that's --

5     and to be clear, I'm not saying that that doesn't mean that

6     they have a valid claim in bankruptcy.  What I'm saying is

7     you focus on what happened on the petition date, what the

8     state of claims was on the petition date.  If they didn't

9     make a demand, as required by the agreement, the only

10    agreement, then they -- it's still contingent.

11             THE COURT:  So is it your position that the Court

12    can't look beyond what was filed on the petition date?  Can

13    this Court look at the proof of claim that was filed by LHP?

14             MR. WAXMAN:  I think --

15             THE COURT:  Can this Court look to the exhibits

16    that have been provided?

17             MR. WAXMAN:  Your Honor, that's -- that is a good

18    question.  Excuse me while I get some water and I think about

19    that.

20             THE COURT:  I mean, do I have the ability to look

21    at the totality of the circumstances here?

22             MR. WAXMAN:  I'm thinking about it in a couple of

23    ways.

24             The first is claims are *prima facie* valid.  As a

25    matter of --

1          THE COURT:  Allegheny.

2          MR. WAXMAN:  Right.

3          On the other hand, having a claim that somebody

4     files doesn't necessarily mean that it's correct.  I mean, in

5     the W.R. Grace case, when I was just a wee lad and people

6     were still writing on, you know -- you know, with slate and

7     hammer and chisel, there was a prisoner who wrote in that

8     they were owed like $2 trillion.  There are lots of claims

9     that aren't exactly at that level, but there are lots of

10     claims that are just incorrect.

11          In fact, there was one that was wildly incorrect,

12     that was Proof of Claim Number 1.  And I called counsel -- or

13     I called the underlying claimant, I should say, and I was

14     like why did you file this claim against the debtor.  And the

15     company said, well, we -- the person I spoke with said, well,

16     it looks like this is against Alecto Healthcare.  And I said,

17     well, it's not Alecto Healthcare, it's another affiliate of

18     the company, and they withdrew the claim.

19          In this case, I expect that Claim Number 18-1 will

20     be the subject -- would be the subject of an objection.  How

21     does the Court balance that?  Frankly, I don't know.  But I

22     think the Court has to have at least a jaundiced view towards

23     proofs of claim that are filed that are not even included on

24     the schedules and statements of financial affairs.  And in

25     this case, there is -- this entity does not have a claim,

1     certainly not in the amount of $245,000.

2             But again, that's not particularly relevant to the

3     immediate issue before Your Honor because the claim that is

4     the fulcrum, LHP's claim, was, again, unliquidated and was

5     contingent on the petition date.

6             I want to move on to unliquidated unless Your Honor

7     would like to continue to discuss --

8             THE COURT:  No, that's okay.

9             MR. WAXMAN:  Similar to the analysis that we

10    discussed above, unliquidated -- excuse me -- the tern

11    "liquidated" and "unliquidated" are not defined by the

12    Bankruptcy Code.  So, again, you look at common usage.

13    Black's Law Dictionary defines it as a claim which is in the

14    amount owed that has not been determined.

15             "An unliquidated claim is not a claim in which the

16             amount has been determined."

17             And that's RNI Wind Down, and that's the Delaware

18    Bankruptcy Court.

19             The Miseo case (phonetic), which is the Second

20    Circuit, unliquidated typically refers to a claim's value and

21    the size of the corresponding debt and the ease at which that

22    value can be ascertained.

23             When considering whether or not a claim is

24    unliquidated, courts tend to look at the knowability of the

25    claims to take into account in determining whether or not

1    they are liquidated.

2           One of the other key tests that courts have cited,

3    and the Reed Creditors have cited at least three cases for

4    this proposition, which is a debt is liquidated if its amount

5    is readily and precisely determinable, where the claim is

6    determinable by reference to an agreement.  Readily and

7    precisely determinable.

8           In this case, you couldn't argue that the LHP claim

9    was either readily determinable or precisely determinable.

10   This is similar to the May case that was cited.  And again, I

11   quote:

12           "Although the term 'liquidated' is not defined in

13           Section 109, courts have generally held that a

14           claim is liquidated if its amount is readily and

15           precisely determinable."

16           And again, Mitchell, another case cited by the Reed

17   Creditors.  Whether a debt is liquidated turns on whether it

18   is subject to ready determination and precision in

19   computation of the amount due.  Readily discernible, with

20   precision.

21           Not readily determinable because no demand had been

22   made, so we didn't know the amount.  Precision because 30

23   percent, by Mr. Sarrao's estimate, is for an estimated claim

24   that, by its very def -- if you look at the underlying

25   amount, if you look at the underlying invoices that were

1    produced after we had requested them post-petition, it is

2    estimated CAM charges.  There is no precision.  There is

3    reconciliation or a true-up at the end of the year, but for

4    now, there is no readily -- as of the petition date, there

5    was no readily determinable and no precision.  Accordingly,

6    it is un -- that claim was unliquidated as of the petition

7    date.

8              I'm going to pause for a second.

9              THE COURT:  I struggle with how -- and let's -- and

10   hypothetical, how a debtor might know that it has an expense,

11   a routine monthly expense that it has not paid, because it

12   doesn't receive a demand, it's not readily or precisely

13   determinable.

14             MR. WAXMAN:  The fact that it didn't make demand

15   doesn't necessarily mean that there is no obligation.  The

16   debtor acknowledged that there's an obligation.  It put it on

17   the schedules.  It knew that there was the settlement

18   agreement out there.  It knew about Paragraph 6.  But --

19             THE COURT:  And it knew what the lease said --

20   let's bifurcate it for a minute.  They knew what the lease

21   said with respect to base rent.

22             MR. WAXMAN:  Well, except there's no knowledge

23   about what has been sublet.  There's no idea about what the

24   CAM charges are going to be.  There's still a lot of deltas

25   that are in there that could make a significant difference.

1      So it's not easy to see that it's --

2                  THE COURT:  Isn't the only delta here really CAM?

3                  MR. WAXMAN:  No.  Respectfully, no.  There was one

4      property, you have testimony -- and again, Alecto -- Mr.

5      Sarrao is the only person who testified today.  Everything

6      else is documentary.  But there's testimony that at least one

7      of the properties, one of the premises was sublet.  We have

8      no idea if there were others.  So, to that point, the amount

9      could still be less than that amount if there was additional

10     premises that were sublet.  There could have been payments

11     that were made by other obligors.

12                 THE COURT:  Who were the other obligors?  There --

13                 MR. WAXMAN:  The two other --

14                 THE COURT:  Alecto --

15                 MR. WAXMAN:  Yes.

16                 THE COURT:  -- entities.

17                 MR. WAXMAN:  Yes.

18                 THE COURT:  Of which Mr. Sarrao is the executive

19     vice president for all three, right?

20                 MR. WAXMAN:  He is.  But that doesn't mean he's in

21     charge of writing the checks, Your Honor.  There is -- there

22     are other employees.  Actually, Mr. Sarrao isn't an employee,

23     as he stated, so there are employees of the other entities.

24                 But more than that, Your Honor, because -- and

25     again, I don't mean to go back to this notice, but that's the

1    trigger.  Without that, it is simply contingent.

2            And yes, you could say to the -- to a debtor, to

3    every debtor, I expect that, in terms of preparing your

4    schedules, you're going to do a complete, absolute review of

5    every underlying document and make a determination as to what

6    the underlying claim is.  But that's -- the -- what is

7    required is the best effort to be diligent.

8            Let's take a slightly different example.  The

9    market price of fish changes every day.  You go into a

10   restaurant, whatever the market price is.  If you had a

11   debtor that was, say, a restaurant and was getting fish every

12   day by the pound and then, at the end of the week, the fish

13   monger would send a bill to the restaurant, just because they

14   received a hundred pounds of tuna doesn't mean that the

15   restauranteur knows how much it owes the fish monger.

16           Here, you've got properties that can be and some --

17   at least one was sublet and you have CAM charges.  They vary

18   and are subject -- that, by definition on the invoice, are

19   estimates and they're subject to a true-up.  Accordingly,

20   Your Honor, these -- this is both unliquidated and

21   contingent.

22      (Pause in proceedings)

23           MR. WAXMAN:  (Indiscernible) just look through my

24   notes, Your Honor.  Again, I'm trying not to repeat what's in

25   the pleadings.

1          (Pause in proceedings)

2          MR. WAXMAN:  Your Honor, I did want to address one

3     of the questions that Your Honor asked counsel for the Reed

4     Creditors.  Does it matter if there's no guarantee in this

5     case?  Yeah, it makes a big difference in terms of the

6     analysis.  And the analysis is everything is triggered from

7     the settlement agreement.  It's what the parties intended to

8     do, that's how the parties intended to operate.

9          And there was a one-year period of forbearance

10    under Paragraph 8.

11          THE COURT:  But that expired.

12          MR. WAXMAN:  It did.  And still, they didn't send a

13    notice.  In fact, I think it was approximately 16 months

14    after the settlement agreement (indiscernible) had been

15    executed, consummated, and they still hadn't sent one.

16          THE COURT:  If there was a guarantee --

17          MR. WAXMAN:  Which there isn't, but yes, Your

18    Honor.

19          THE COURT:  -- does the debtor step into the shoes

20    of the obligor?

21          MR. WAXMAN:  I don't know, Your Honor.  That's a

22    fair question.  I don't know.  But to be fair, I don't really

23    spend a lot of time thinking about it because that isn't the

24    situation.  Frankly, the language in the settlement agreement

25    is so clear that it's like asking how I should play a

1    baseball if gravity disappeared.

2         It just -- the fact is there is that paragraph.

3    Everything is subsumed, is superseded by the settlement

4    agreement.  And I know that's not what the Reed Creditors

5    want to hear, but they weren't parties to the agreement and

6    they -- and their view of the intent of the parties is

7    irrelevant.  The language is as clear as it possibly could

8    be.

9         If I can have a second, Your Honor?

10        THE COURT:  Uh-huh.

11    (Pause in proceedings)

12        THE COURT:  Mr. Waxman, can I ask you a question?

13    And apologies for interrupting your thought process.

14        MR. WAXMAN:  That --

15        THE COURT:  But what do you make of cases like

16    Sullivan that say eligibility is determined by what the

17    debtors owe on the petition date, not what they think they

18    owe.

19        MR. WAXMAN:  I'm sorry.  Can you say that one more

20    time, Your Honor?

21        THE COURT:  What is your position with respect to a

22    case such as Sullivan that states that eligibility is

23    determined by what the debtors owe on the petition date, not

24    what the debtors think they owe?

25        MR. WAXMAN:  Your Honor, I think that what the

1   debtors owed on the petition date is accurately reflected by

2   they underlying -- what was actually owed on the petition

3   date.  Again, "owe" means that they are responsible for

4   payment.  In this case, they weren't responsible for payment

5   because the notice hadn't been given for a demand.  So I

6   think, in this case, they didn't owe $7.5 million.

7           THE COURT:  But your witness understood that no

8   payments had been made.

9           MR. WAXMAN:  I will concede that.  It -- no payment

10  -- that payments had not been made?  Yes.

11          THE COURT:  But you didn't owe it because there had

12  been no demand.

13          MR. WAXMAN:  There was no right to payment by LHP

14  on the petition date because the triggering event had not

15  occurred.

16          Your Honor, I would like to make a couple of notes

17  with respect to the two-hundred-and-forty-five-thousand-

18  dollar claim, if I might, because I know Your Honor will be

19  reviewing it.  I don't know that it's particularly relevant.

20          MR. SULLIVAN:  I object, Your Honor.  He didn't ask

21  Mr. Sarrao to testify about this claim.  It's inappropriate

22  for him to talk about the claim now.

23          THE COURT:  Yeah, I'm going to --

24          MR. WAXMAN:  Okay.

25          THE COURT:  I'm going to --

1      MR. WAXMAN:  That's fine, Your Honor.

2           But Your Honor, it -- again, it keeps coming back

3  to the issue of whether or not these are contingent and

4  unliquidated.  And under every test, they're both contingent

5  and unliquidated.

6           If Your Honor has --

7           THE COURT:  Wait.  So I --

8           MR. WAXMAN:  -- any quest --

9           THE COURT:  -- think that you and Mr. Sullivan both

10  agree on that point, that that is what the issue is here.

11           MR. WAXMAN:  I'm sorry.  That's the initial what?

12           THE COURT:  That's the issue here.  I mean, I'll

13  let Mr. Sullivan speak for himself, but I don't think he

14  disagrees with you.  I think you interpret this differently.

15           MR. WAXMAN:  I think that that's fair.  I think Mr.

16  Sullivan and I disagree on the interpretation.  I think that

17  the documents support us.  I think his -- I think the Reed

18  Creditors' argument is premised upon the guarantee and ours

19  is premised upon the superseding document and the

20  requirements by the superseding document.

21           Your Honor, if Your Honor would like to hear from

22  Mr. Sarrao about the two-hundred-and-forty-five-thousand-

23  dollar claim, he's here.

24           THE COURT:  I don't.

25           MR. SULLIVAN:  The record is closed.

1                 MR. WAXMAN:  I figured.  Actually, Your Honor never

2      closed the record, but that's fine.

3                 Your Honor, I have nothing further, other than to

4      say the request by the Reed Creditors should be denied.  The

5      case should move forward as promptly as possible.  We've

6      spent a lot of money on the Reed Creditors' motion for

7      appointment of a committee, for this motion.  This case needs

8      to get out of the mud and move towards confirmation or

9      there's just not going to be anything there for creditors at

10     all.  Thank you.

11                THE COURT:  Thank you.

12                Oh, Mr. Minuti?

13                MR. MINUTI:  Good afternoon, Your Honor.  Mark

14     Minuti from Saul Ewing.  I represent LHP Hospital Group.

15                This is the second time in this case I didn't think

16     I was going to be talking and doing mostly listening, but I

17     do have to rise, Your Honor, and just reserve rights.

18                Coming into today's hearing, Your Honor, obviously,

19     my client filed a proof of claim.  That proof of claim has

20     not been objected to.  Our understanding, clearly, was that

21     the debtor's position with respect to today's motion was

22     because the claim was contingent because no demand had been

23     made.  That was the basis on which they were defending.

24                We don't take a position on today's hearing, Your

25     Honor, we didn't file a pleading, we don't take a position on

1    the motion.  But Your Honor raised a couple of questions that

2    caused me some concern because I'm concerned that the Court

3    were to rule on this matter in a way that would prejudice our

4    ability to press that proof of claim when there's no

5    objection that's been filed to it.

6          You know, in terms of whether that guarantee

7    continues, Your Honor, I think my client would be -- clearly

8    believes it does continue.  And if that is important, that

9    issue, resolution of that issue is important to Your Honor to

10   resolve today's motion, then I think it would be appropriate

11   to provide my client with an opportunity to weigh in because

12   we had no notice that issue would be coming up today.  And

13   I'm just concerned that Your Honor would rule today in a way

14   that's going to bind or prejudice my client in connection

15   with the proof of claim.

16         I don't think Your Honor needs to get there, but I

17   did have that concern and wanted to raise that concern.

18   Thank you, Your Honor.

19         THE COURT:  Thank you.

20         Are you -- let me just ask, Mr. Waxman.  I'm sorry,

21   Mr. Sullivan.  But when we began our discussion today after

22   lunch, I want to make sure I understood correctly.  Let me

23   look at my notes here, bear with me a second.  We were

24   admitting proofs of claim, but we were reserving all rights

25   with respect to proofs of claim for objection and defending

1    proofs of claim, correct?

2            MR. WAXMAN:  Correct, Your Honor.

3            THE COURT:  And they weren't being admitted for the

4    truth of the matter asserted?

5            MR. WAXMAN:  Correct, Your Honor.

6        (Pause in proceedings)

7            THE COURT:  Mr. Sullivan, did you want to comment?

8    I couldn't tell if you were getting ready to comment.  Sorry.

9            MR. SULLIVAN:  I -- no, I wasn't, Your Honor.

10           THE COURT:  Pardon?

11           MR. SULLIVAN:  I wasn't planning to comment.

12           THE COURT:  Oh, okay.  All right.  Okay.

13           Mr. Sullivan has -- I'm sorry.  Did you want to say

14   something?

15           MR. WAXMAN:  No.  You just asked me --

16           THE COURT:  That was the only question I had.

17           MR. WAXMAN:  Oh, okay.

18           THE COURT:  I wanted to clarify the record on that,

19   given Mr. Minuti's comments.

20           MR. WAXMAN:  And Your Honor, just to finish up with

21   that, and then I'll cede the podium to Mr. Sullivan, this

22   isn't intended to prejudice Mr. Minuti's rights, his client's

23   proofs of claim.  Again, this goes back to what was the total

24   amount of liquidated, non-contingent claims on the petition

25   date.

1          THE COURT:  This is an eligibility issue, not a

2   proof of claim issue.

3          MR. WAXMAN:  Correct, Your Honor.

4          THE COURT:  I should ask.  I just want to confirm

5   no one else wanted to be heard this afternoon.  The U.S.

6   Trustee, Sub V Trustee, do either take a position here today?

7          MS. NIMEROFF:  Good afternoon, Your Honor.  Jami

8   Nimeroff, Subchapter V Trustee.

9          Your Honor, I generally don't take a position on

10  eligibility issues.  If the case remains a Sub V, I will

11  happily continue to serve.  I would leave that to the Court.

12  Thank you.

13         MS. CASEY:  Good afternoon, Your Honor.  Linda

14  Casey on behalf of the United States Trustee.

15         There are some very interesting issues today, but

16  the United States Trustee has elected to not intervene in

17  this case.  There are two parties who have joined in the

18  issue, and so we're taking --

19         THE COURT:  Okay.

20         MS. CASEY:  -- a position today.

21         THE COURT:  All right.  Thank you.

22         Mr. Sullivan, you get the final word.

23         MR. SULLIVAN:  Your Honor, I do want to start on

24  the issue of -- and you know, I think you referred a question

25  to Mr. Waxman about -- and I lost my note for a second, just

1    -- it's not what the debtors think they owe on the petition

2    date, it's what they owe.

3         And I do want to elaborate on that point a little

4    bit because, when they file the schedules, that's not on the

5    petition date.  And they obviously are looking at information

6    that --

7         THE COURT:  Wait.  Say that again.  When they filed

8    the schedules?

9         MR. SULLIVAN:  When they file the schedules, that's

10   not on the petition date, right?  They're scheduling debts in

11   the amount due on the petition date, but they're looking at

12   information that they may gather or they may have, they're

13   looking at it as it comes in.  So, when they file the

14   schedules, it's not, well, here's what we knew on the

15   petition date.  It's here's what we know 20 days later about

16   what's owed on the petition date.  All right?

17        Then so the issue was asked, well, should you

18   consider claims in this process.  And the cases come out that

19   you should.  But let me refer you to a case that was

20   mentioned in their briefs, in their response, and it's in the

21   In Re Parking Management case, 620 B.R. 544, because it has a

22   very helpful paragraph about this.  And I'm looking at Page

23   551 of that case, which starts with a paragraph that talks

24   about Chapter 12 and 13, and it then says:

25        "However, when Congress expanded the reach of

1                    Subchapter V to debtors who have up to 7.5 million

2                    in debts, it made Subchapter V available to

3                    entities having more complex creditor relationships

4                    than a debtor in a typical Chapter 12 or 13 case.

5                    This case is an example."

6                    "This case" being the parking authority case.

7                    And then it closes that paragraph by saying:

8                    "These more complex creditor relationships may well

9                    lead to bona fide disputes over the proper

10                   characterization of creditor claims."

11                   But that:

12                   "The Court need not find a lack of good faith or

13                   candor to conclude it should review the claims in

14                   this case."

15             And there are cert -- there are certain cases that

16     talk about the Chapter 13 standard, and the Cox case was one

17     of them.  And the Cox case got to it a different way.  In the

18     Cox case, the Court was expounding on the rule that says,

19     absent good -- a showing of bad faith, the debtor's schedules

20     should be respected.

21            But what the Cox case -- and this is 2016 WL

22     5854214.  It found that the creditor's objection to the

23     eligibility was in good faith and says:

24                "Therefore, given the good faith objection, the

25                Court will inquire beyond the debtors' originally

1              filed schedules in its 109(e) eligibility

2              analysis."

3         So, either way that the Court looks at it, the

4    cases lead you to the fact that you can consider proofs of

5    claim which are filed even after the schedules.  And of

6    course, by that time, the debtor knows, through its nondebtor

7    subsidiary, what the amount being claimed is.  So there

8    really isn't a dispute because LHP has claimed what it is and

9    the Court is entitled to look at that claim when it's filed.

10   We have spent a lot of time on that claim.

11        I do want to try to make sure we're clear on this

12   estimated CAM issue.  Okay?  "Estimated CAM" is a term of art

13   in the lease and it's a requirement for payment on the lease,

14   just like base rent.  It's a different element of payment.

15   And essentially, as you know, Your Honor, landlords take last

16   year's 12 months and divide it by 12 and say that's your

17   estimated CAM that you have to pay.

18        So it's a -- the fact that it's listed as an

19   estimate doesn't make LHP's claim contingent at all.  LHP's

20   claim is based on the guarantee that the debtor provided, and

21   LHP paid the amount.  All of the issues about subletting by

22   whoever has the access, that's LHP's job to take into account

23   with the landlord and pay as little as possible.  That's

24   their goal.  But once they pay it, the debtor has

25   unconditionally agreed that it owes it whether you take the

1    settlement agreement as the binding agreement or whether you

2    don't.

3              But the settlement agreement can't be read without

4    understanding that the basis for future expenses is the

5    guarantee and the purchase agreement.  So, if you go to

6    Paragraph 6 --

7              THE COURT:  Well --

8              MR. SULLIVAN:  -- it says, "Accordingly" -- this is

9    six lines in Paragraph 6 of the settlement.  It says:

10             "Accordingly, the Alecto Defendants agree to the

11             following procedure for payment of future

12             expenses."

13             The only place "future expenses" is defined is in

14   the whereas clause that we looked at, the eighth whereas

15   clause.  And the definition, as I see it, starts with "out-

16   of-pocket" in the first line:

17             "-- out-of-pocket expenses payable to Altera, the

18             landlord, for which Alecto Sherman has an

19             obligation to indemnify LHP under the operative

20             agrees and the debtor has guaranteed those

21             obligations."

22             Future expenses.  Those are under the operative

23   agreements.  That's the term "operative agreements."  Those

24   agreements are not being canceled by this document.

25             THE COURT:  Mr. Sullivan, how does 6(d) --

1          MR. SULLIVAN:  How does what?

2          THE COURT:  How should the Court interpret 6(d)

3    with respect to the issue before it right now, as to what

4    could be contested?

5          MR. SULLIVAN:  So what 6(d) says -- and I asked Mr.

6    Sarrao about it -- is that, as against a claim by LHP, they

7    are not permitted to say no, there's -- we have a defense,

8    you didn't -- you failed to mitigate, any other defense.  The

9    only defense it has is you didn't calculate correctly, so

10   they can ask -- it's the same as if it went to a confessed

11   judgment.  The confessed judgment clause says the same thing,

12   and that is, you know, if you send us the underlying

13   documents and we see that you, you know, didn't calculate

14   correctly, then they can raise that.  But this is really just

15   a question of whether they want to pay before a judgment gets

16   entered against them.  There isn't any other defenses that

17   can be raised.

18          And Your Honor, going back to the CAM thing, if you

19   look at the individual exhibits, you'll see the estimate CAM

20   is the same every month.  Okay?  That's liquidated.  It's the

21   same number for each of the five weeks, it's every month for

22   a year, until the amount changes.  That's liquidated.  That's

23   what "liquidated" means, readily available and identifiable

24   from a document.  And in this case, it's the lease that

25   provides for it, in connection with any other notices issued

128

1       by the landlord.

2               The issue of contingent claims was also addressed

3       in the parking authority case.  And if you pay careful

4       attention to the parking authority case, what it says is, for

5       lease rejection claims, those are not going to count because

6       it relies on the Court entering an order rejecting the

7       leases, which necessarily occurs after the petition date.

8               THE COURT:  Right.

9               MR. SULLIVAN:  But for pre-petition lease claims,

10      those were scheduled and counted in the parking -- and again,

11      it's in dicta, so, you know, it's not readily available.

12              But what we have here is pre-petition lease

13      rejection -- I mean -- not -- pre-petition lease-based claims

14      that have accrued.  The payments have been made and the

15      obligations have accrued.

16              THE COURT:  You're asking the Court to adopt an

17      analysis similar to Macedon case or Macedon case?

18              MR. SULLIVAN:  Well, no.  I -- what I say in the

19      Macedon Consulting case is that, in that case, the Court

20      considered all of the obligations under the lease until they

21      expire.

22              THE COURT:  Right.

23              MR. SULLIVAN:  But I'm not asking for that.  All

24      I'm asking -- the -- LHP didn't ask for that.  I'm just

25      speaking as to what L-H -- LHP only asked up to the petition

1  date.

2           THE COURT:  Right.

3           MR. SULLIVAN:  So Macedon Consulting was relevant

4  in terms of saying -- it's the same holding as Parking --

5           THE COURT:  Determining whether or not it was

6  contingent.

7           MR. SULLIVAN:  Yes.

8           THE COURT:  Mr. Sullivan, let me ask you:  What is

9  your position -- or what's your response to debtor's position

10  these are contingent because no demand was issued?

11          MR. SULLIVAN:  Your Honor, I did not hear.

12          THE COURT:  Oh, I'm sorry.  These were -- this was

13  contingent because there was no demand issued.

14          MR. SULLIVAN:  Your Honor, I think I addressed that

15  before.  But the -- from my standpoint, the demand is only an

16  opportunity for them to stop a confessed judgment.

17          THE COURT:  Okay.

18          MR. SULLIVAN:  That's it.  And both the demand

19  process and the confessed judgment go out the door when they

20  file bankruptcy.  You can't go for a confessed judgment, you

21  can't issue a demand.  That's why the June 28th letter

22  doesn't reference either the debtor or Sherman/Grayson, it

23  just references Sherman Alecto.

24          But the idea that they -- because they didn't get

25  the letter until after they put their schedules out --

1    although it was two days before that -- that someone affects

2    whether this claim should be counted is really just a faulty

3    analysis.  This Court can consider the claims that were

4    filed.  And we spent a lot of time with the claims to show

5    that this is not something that can be considered contingent

6    or unliquidated.

7              THE COURT:  Should the Court consider at all that

8    there was four months between -- I don't know what the

9    terminology is.  There was an effective date and it was a

10   year after the agreement, right?  And then there was another

11   four months before the petition date before a demand was

12   made.  Is that relevant at all?

13             MR. SULLIVAN:  No.  Every collection document that

14   is drafted by good counsel says, if we don't issue a demand,

15   that doesn't -- we don't waive anything.  And LHP may have

16   had their own reasons for not issuing a demand prior to the

17   bankruptcy because the debtor was trying to sell the

18   Sherman/Grayson Hospital.  I don't know.  I don't know.

19             THE COURT:  Right.

20             MR. SULLIVAN:  I --

21             THE COURT:  Right.

22             MR. SULLIVAN:  We can speculate, but it really

23   doesn't matter.  There -- the --

24             THE COURT:  So, if it doesn't matter, how do the

25   Alecto Debtors -- or Alecto Defendants -- excuse me -- as

1    used under the settlement agreement, then how do they know

2    what's payable?

3              MR. SULLIVAN:  Well, what they know doesn't really

4    matter, Your Honor.  What has accrued and what is due is what

5    matters.  And Hall makes it perfectly clear, it doesn't

6    matter what they know.

7              The only other thing I'll say, Your Honor, and

8    again, going back to the debtor's interpretation that a

9    standard clause, boilerplate entire agreement clause, wipes

10   out a guarantee and a purchase agreement and other documents

11   is, if you treat it that way, that all of those documents are

12   wiped out, there is no reference contained in this document

13   as to what LHP can charge.  There's no basis to figure it

14   out.

15             Those are the -- those are the -- so, in order to

16   read "future expenses," if you don't refer to the definition

17   and to those operating agreements, then presumably LHP can

18   ask for whatever they want and the debtor has to pay it.  I

19   don't know how the debtor could contest the calculation,

20   either, if it didn't ask for the documents that were required

21   under the operative agreements.

22             So, Your Honor, I think that's the critical issue

23   here.  And I think that the confidential settlement agreement

24   created a mechanism to streamline the issues moving forward,

25   understanding that the debtor had defaulted and turned back

1    the properties, but still owed some leases until '24 and

2    other leases until 2027.  And that's -- it's a procedural

3    device to handle payments going forward, but it doesn't wipe

4    out the obligations, which were known and which were accrued

5    as of the petition date.  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. WAXMAN:  Your Honor, may I be heard on one very

8    quick point?

9              THE COURT:  Yes, but I'm going to give Mr. Sullivan

10   the last word.

11             MR. WAXMAN:  That's fine, Your Honor.

12             Your Honor, I would just ask -- Mr. Sullivan just

13   made the statement that all of the CAM was the same for the

14   last few months.  I would just ask that Your Honor refer to

15   Exhibits 58, 59, 60, 61, 62.  You'll see that the CAM is

16   still different each month.  There are -- some months are the

17   same for at least some of the properties, but other months

18   are different.

19             THE COURT:  Okay.

20             MR. WAXMAN:  Again, I would just -- I'm looking at

21   58, in particular, 60, and 61.

22             THE COURT:  Okay.

23             MR. WAXMAN:  Thank you, Your Honor.

24             THE COURT:  Thank you.

25             Anything further, Mr. Sullivan?

1          MR. SULLIVAN:  I'm okay with whatever you want to

2     look at, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          I do appreciate the presentation and I do think

5     there are some interesting issues that have been presented

6     here.

7          I'm going to take this matter under advisement.

8     And candidly, Mr. Minuti, raises an interesting issue that I

9     pondered last evening and -- but at this juncture, I'm going

10    to take a break, I'm going to take it under advisement and

11    will reach out to the parties when I'm going to rule.  I'm

12    not going to make a promise when I'm going to rule.  I just

13    don't know right now.  I want to review these documents.  So

14    we'll reach out to the parties and let you know and we'll get

15    on Zoom and I'll issue my ruling.  Okay?

16         And at that time, Mr. Waxman, we can have a further

17    status conference on Agenda Item 1.

18         MR. WAXMAN:  That was going to be my

19    recommendation, is we can determine what should be done after

20    Your Honor makes its ruling.  Certainly, that seems

21    appropriate.

22         THE COURT:  Okay.  All right.  Anything further for

23    today?

24         MR. SULLIVAN:  Thank you for your time, Your Honor.

25         THE COURT:  Oh, certainly.

1        MR. WAXMAN:  Thank you, Your Honor.

2        THE COURT:  And thank you for your arguments.

3        We'll stand adjourned and we'll get in touch with

4    you.  Thank you.

5        MR. SULLIVAN:  Thank you.

6        (Proceedings concluded at 3:12 p.m.)

7                      *****

8                   CERTIFICATION

9        I certify that the foregoing is a correct

10    transcript from the electronic sound recording of the

11    proceedings in the above-entitled matter to the best of my

12    knowledge and ability.

13

14

15

16

17    _____          December 3, 2023

18

19    Coleen Rand, AAERT Cert. No. 341

20    Certified Court Transcriptionist

21    For Reliable

22

23

24

25